Case Nos. 24-1828 (L), 24-1831, 24-1832

———————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————————

IN RE: GARDASIL PRODUCTS LIABILITY LITIGATION

———————————————————

TESSA NEEDHAM,

*Plaintiff-Appellant,*

v.

MERCK & COMPANY, INC. et al.,

*Defendants-Appellees.*

———————————————————

ANGELA M. WALKER,

*Plaintiff-Appellant,*

v.

MERCK & COMPANY, INC. et al.,

*Defendants-Appellees.*

———————————————————

SHANIE D. ROMAN,

*Plaintiff-Appellant,*

v.

MERCK & COMPANY, INC. et al.,

*Defendants-Appellees.*

———————————————————

On Appeal from the United States District Court of the Western
District of North Carolina, Nos. 3:22-md-03036; 3:24-cv-00291, 3:24-cv-
00433, and 3:24-cv-00278

———————————————————

PLAINTIFFS-APPELLANTS' OPENING BRIEF ON APPEAL

———————————————————

Margery S. Bronster
Robert M. Hatch
BRONSTER FUJICHAKU
ROBBINS
1003 Bishop Street, Suite 2300
Honolulu, HI 96813
Tel : (808) 524-5644
mbronster@bfrhawaii.com
rhatch@bfrhawaii.com
*Counsel for Plaintiff-Appellant
Angela M. Walker*

Allison Mullins
L. Cooper Harrell
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL
& RUSSELL PLLC
300 N. Greene Street, Suite 2000
Greensboro, NC 27401
Tel: (336) 645-3320
amullins@turningpointlit.com
charrell@turningpointlit.com
*Counsel for Plaintiff-Appellant
Tessa Needham*

Bijan Esfandiari
WISNER BAUM
11111 Santa Monica Blvd.
Suite 1750
Los Angeles, CA 90025
Tel: (310) 207-3233
besfandiari@wisnerbaum.com
*Counsel for Plaintiff-Appellant
Shanie D. Roman*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>24-1828 L</u>    Caption: <u>In re Gardasil Products Liability Litigation</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Tessa Needham</u>
(name of party/amicus)

_____

 who is _____<u>Plaintiff-Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:




3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Robert M. Hatch                              Date:    December 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1828 L_        Caption: _In re Gardasil Products Liability Litigation_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Shanie D. Roman_
(name of party/amicus)

_____

who is _____Plaintiff-Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Robert M. Hatch                          Date:      December 4, 2024

Counsel for: Plaintiffs-Appellants

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1828 L</u>    Caption: <u>In re Gardasil Products Liability Litigation</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Angela M. Walker</u>
(name of party/amicus)

_____

who is _____<u>Plaintiff-Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: Robert M. Hatch _____        Date: ___ December 4, 2024 ___

Counsel for: Plaintiffs-Appellants _____

- 2 -

[Print to PDF for Filing]

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... v

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

STATEMENT OF CASE .......................................................................... 4

    I.    Statement of Facts .................................................................... 4

          A.    Merck seeks "fast-track" approval for Gardasil to replace the loss of its immensely profitable but dangerous drug Vioxx ................................. 4

          B.    Merck falsely promoted Gardasil as a safe way to end cervical cancer when there is no proof it will eliminate cancer risk ................................. 6

          C.    Gardasil is immensely profitable for Merck ................. 8

          D.    Gardasil causes debilitating autoimmune diseases ...................................................................... 8

          E.    Plaintiffs Needham, Roman, and Walker ..................... 9

    II.    The Course of Proceedings Below .......................................... 13

    III.    The Vaccine Act ...................................................................... 15

          A.    The Vaccine Act intended to create a quick, easy, and generous no-fault compensation system, so children injured by vaccines could receive compensation from the HHS and have less incentive to sue vaccine manufacturers ............... 15

          B.    The VICP is not binding, and petitioners may opt-out and pursue a *de novo* civil action ..................... 17

          C.    The Act's Vaccine Table determines the vaccines subject to the Act and the injuries that are presumptively compensable in the VICP .............. 18

i

D.    The Act's three-year timing requirement ................... 19

E.    The Act provides if any part is unconstitutional,
      the entire Act is unconstitutional ............................ 20

SUMMARY OF ARGUMENT ................................................. 21

STANDARD OF REVIEW .................................................... 25

ARGUMENT ...................................................................... 26

I.    Proper Application of the Vaccine Act Allows
      Plaintiffs to Pursue Their Tort Claims Against Merck ........ 26

      A.    The district court erred in interpreting and
            applying the Vaccine Act ................................ 27

            1.    The VICP, properly explained ........................ 27

            2.    The VICP, properly applied ........................... 30

                  a.    Plaintiffs' path to filing civil actions .......... 30

                  b.    The VICP can properly operate only
                        one way ........................................ 32

      B.    The district court erred when it refused to
            consider the timeliness of plaintiffs' petitions ........... 34

            1.    The Vaccine Act compels a plenary civil
                  action .............................................. 35

            2.    Multiple courts have recognized that a
                  plenary civil action is required .................... 37

            3.    The district court misapprehended its role ....... 39

            4.    Other circuits have recognized that a civil
                  action following an administrative process
                  should be a separate proceeding .................. 41

      C.    The district court erred when it deprived
            plaintiffs of their opportunity to establish
            equitable tolling ........................................... 42

ii

D.   The district court erred when it stated plaintiffs should have appealed to the Court of Federal Claims and federal circuit ............................................. 47

II.   The District Court erred in granting Defendant's Motion for Judgment on the Pleadings ................................. 48

A.   The District court erred *procedurally* by dismissing various *factual allegations* within claims on a Rule 12(c) motion ...................................... 49

B.   The district court's dismissal of allegations identifying ingredients in Gardasil and inadequacies in the testing of Gardasil was substantively flawed ...................................................... 53

1.   Allegations and Evidence Regarding Gardasil's *Ingredients* are relevant to *plaintiffs' failure to warn claims* .......................... 55

2.   Allegations concerning the manner in which Merck conducted its clinical trials and safety testing is relevant to Plaintiff's negligence and failure to warn claims ............... 59

C.   The district court *substantively* erred in purportedly dismissing factual allegations concerning Merck's misrepresentations and concealment of autoimmune injuries in its direct-to-consumer television advertising ................... 62

1.   Once Merck Chose to Communicate Directly to Patients Through Television Advertising, Merck Undertook a Duty to Speak the Whole Truth and to Not Mislead ............................................................. 64

2.   Affirmative fraud premised upon the direct-to-consumer advertisements was adequately pled ...................................................... 68

III.   The Vaccine Act Is Unconstitutional ..................................... 70

iii

A.    The Secretary rewrote the statutory Vaccine
Table to destroy the balance struck by Congress
in 1986 .......................................................................... 73

B.    The Vaccine Act violates the presentment
clause .......................................................................... 75

1.    The Supreme Court's Presentment Clause
Cases, *Field* and *Clinton* .................................... 77

a.    *Field* distinguished between
Congress delegating power to
execute a statue and impermissibly
delegating power to make the law ............ 77

b.    *Clinton* held the Line-Item Veto Act
violated the presentment clause and
was unconstitutional .................................. 78

c.    *Terran* is contrary to *Clinton* as
shown by Judge Plager's dissent ............... 82

VII.    Conclusion.......................................................................... 90

VIII. Request for Oral Argument .......................................... 90

iv

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alpha Tech Pet Inc. v. LaGasse*, LLC,
  2017 WL 5069946 (N.D. Ill. Nov. 3, 2017) ............................................ 51

*Altria v. Good*,
  555 U.S. 70 (2008) ...................................................................... 64

*Atchison, Topeka & Santa Fe Ry. Co. v. Buell*,
  480 U.S. 557 (1987) ...................................................................... 22

*Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*,
  852 F.3d 1078 (D.C. Cir. 2017) ................................................... 76, 87, 88

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v.
  Just Born II*,
  888 F.3d 696 (4th Cir. 2018) ................................................................ 68

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020) ................................................................... 73, 76

*BBL, Inc v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) ......................................................... 23, 51

*Blackmon v. Am. Home Prod. Corp.*,
  328 F. Supp. 2d 647 (S.D. Tex. 2004) ................................................... 44

*Bolender v. Carnival Corp.*,
  2014 WL 12527190 (S.D. Fla. Apr. 7, 2014) ......................................... 52

*Brice v. Sec'y of Health and Human Servs.*,
  240 F.3d 1367 (Fed. Cir. 2001) ......................................................... 43

*Bruesewitz v. Wyeth, LLC*,
  562 U.S. 223 (2011) ................................................................... *passim*

*Capizzano v. Sec'y of Health & Hum. Servs.*,
  440 F.3d 1317 (Fed. Cir. 2006) ......................................................... 21

*Case v. Merck & Co.*,
  No. 02-1779, 2002 U.S. Dist. Lexis 21486 (E.D. La. 2002) .................. 37

*Cincinnati, W. & Z.R. Co. v. Clinton Cnty. Comm'rs,*
 1 Ohio St. 77 (1852) ............................................................... 78

*Clinton v. City of New York,*
 524 U.S. 417 (1998)...................................................... *passim*

*Cloer v. Sec'y of Health & Human Servs.,*
 654 F.3d 1322 (Fed. Cir. 2011) .................................... 19, 43

*Colbath v. Merck,*
 2022 WL 935195 (S.D. Cal. Mar. 29, 2022) ......................... 63

*Crews v. W.A. Brown & Son, Inc.,*
 106 N.C. App. 324 (1992)....................................................... 55

*Davis v. Wyeth Lab'y's, Inc.,*
 399 F.2d 121 (9th Cir. 1968)......................................24, 58-59

*DeConstanzo v. GlaxoSmithKline PLC,*
 643 F. Supp. 3d. 340 (E.D.N.Y. 2022) ........................... *passim*

*Dennis v. Bayer Healthcare Pharms.,*
 2020 WL 534307 (W.D.N.C. Feb. 3, 2020) ........................... 68

*Doe v. Bayer Corp.,*
 367 F. Supp. 2d 904 (M.D.N.C. 2005) ................................... 37

*Doe v. Regents of the Univ. of California,*
 2023 WL 6194148 (C.D. Cal. Aug. 11, 2023) ....................... 51

*Doe v. U.S.,*
 821 F.2d 694 (D.C. Cir. 1987)......................................... 41, 42

*Doe 2 v. Ortho-Clinical Diagnostics, Inc.,*
 335 F. Supp. 2d 614 (M.D.N.C. 2004) ....................... 37, 38, 39

*Edwards v. City of Goldsboro,*
 178 F.3d 231 (4th Cir. 1999).................................................. 25

*Elam v. Lincoln Elec. Co.,*
 362 Ill. App. 3d 884 (2005) .................................................... 61

*Evans v. Eaton Corp. Long Term Disability Plan,*
 514 F.3d 315 (4th Cir. 2008)................................................. 41

*Figueroa v. Sec'y of Health & Human Servs.*,
　715 F.3d 1314 (Fed. Cir. 2013) ....................................... 16, 21

*First United Methodist Church v. U.S. Gypsum Co.*,
　882 F.2d 862 (4th Cir. 1989) ......................................... 33-34

*Fleet Credit v. Sion*,
　893 F.2d 441 (1st Cir. 1990) .............................................. 49

*Fontenot v. TASER Int'l*,
　2011 WL 2535016 (W.D.N.C. June 27, 2011) ...................... 60

*Fontenot v. Taser Int'l, Inc.*,
　736 F.3d 318 (4th Cir. 2013) ..................................... 55-56, 60

*Freytag v. Commissioner*,
　501 U.S. 868 (1991) ........................................................... 82

*Gelboim v. Bank of Am. Corp.*,
　57 U.S. 405 (2015) .............................................................. 2

*Goetz v. N.C. Dep't of Health & Human Servs.*,
　203 N.C. App. 421, 692 S.E.2d 395 (2010) .......................... 44

*Gregory v. Novak*,
　121 Or. App. 651 (1993) ..................................................... 65

*Guerrero v. Ollie's Bargain Outlet, Inc.*,
　115 F.4th 349 (4th Cir. 2024) ............................................ 25

*Hebern v. Am. Cyanamid Co.*,
　No. A-3063-09T1, 2011 WL 135779 (Super. Ct. N.J. Jan. 13,
　2011) ..................................................................... 45, 46

*Holmes v. Merck*,
　697 F.3d 1080 (9th Cir. 2012) ............................................ 63

*Horne v. Owens-Corning Fiberglas Corp.*,
　4 F.3d 276 (4th Cir. 1993) ................................................. 56

*In re Lowe's*,
　517 F. Supp. 3d 484 (W.D.N.C. 2021) ................................. 47

*In re Prempro Prod. Liab. Litig.*,
　2006 WL 1981902 (E.D. Ark. July 13, 2006) ....................... 61

*In re St. Jude Med. Devices Litig.*,
   2014 WL 12564117 (C.D. Cal. Jan. 22, 2014) ..................................... 59

*In re Testosterone Replacement Therapy Prod. Liab. Litig.*
   *Coordinated Pretrial Proc.*,
   2020 WL 4437829 (N.D. Ill. Aug. 2, 2020) ......................................... 61

*In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*,
   2017 WL 36406 (N.D. Ill. Jan. 3, 2017) .............................................. 60

*Immigr. & Naturalization Serv. v. Chadha*,
   462 U.S. 919 (1983) ............................................... 72, 79, 80, 82

*JPMorgan Chase Bank, N.A. v. Tesla, Inc.*,
   2024 WL 4167340 (S.D.N.Y. Sept. 12, 2024) ..................................... 51

*Kenall Mfg. Co. v. Cooper Lighting*, LLC,
   354 F. Supp. 3d 877 (N.D. Ill. 2018) ................................................... 50

*Knudsen v. Sec'y of Health & Human Servs.*,
   35 F.3d 543 (Fed. Cir, 1994) ........................................................ 16, 22

*Kociemba v. G.D. Searle & Co.*,
   707 F. Supp. 1517 (D. Minn. 1989) ..................................................... 60

*Living on the Edge, LLC v. Lee*,
   2015 WL 12661917 (C.D. Cal. Aug. 25, 2015) .................................... 51

*Lynch v. Jackson*,
   853 F.3d 116 (4th Cir. 2017) ............................................................. 36

*Marshall Field & Company v. Clark*,
   143 U.S. 649 (1892) .................................................................... 77, 78

*McCauley v. Home Loan Inv. Bank*,
   710 F.3d 551 (4th Cir. 2013) ............................................................. 68

*McDonald v. Lederle Labs.*,
   341 N.J. Super. 369, 775 A.2d 528 (Super. Ct. N.J. 2001) .................. 45

*Meade v. Cedarapids, Inc.*,
   164 F.3d 1218 (9th Cir. 1999) ........................................................... 65

*Miller v. 3M*,
   2013 WL 1338694 (E.D.N.C. Apr. 1, 2013) ........................................ 68

*Mills v. Gen Motors Corp.*,
    120 F.3d 262 (4th Cir. 1997)................................................42-43

*Morgan v. Cavalier Acquisition*,
    111 N.C. App. 520 (1993).......................................................60

*Needham v. Sec'y of Health & Hum. Servs.*,
    No. 23-630V, 2023 WL 9287882 (Fed. Cl. Dec. 20, 2023) ...............9, 31

*O'Connell v. Shalala*,
    79 F.3d 170 (1st Cir. 1996) ....................................................83

*Peter J. Hartmann Co. v. Cap. Bank & Tr. Co.*,
    296 Ill. App. 3d 593 (1998) ....................................................65

*Pilliod v. Monsanto Co.*,
    67 Cal. App. 5th 591 (2021)....................................................58

*Ragsdale v. Kennedy*,
    286 N.C. 130 (1974) ...............................................24, 65, 66

*Reed v. Smith & Nephew*,
    150 F. Supp. 3d 671 (S.D. W. Va. 2015).................................68

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012)................................................68

*Rohrbough v. Wyeth Labs.*,
    916 F.2d 970 (4th Cir. 1990)................................................37

*RXD Media, LLC v. IP Application Dev.*,
    377 F. Supp. 3d 588 (E.D. Va. 2019)....................................29

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991)...........................................................40

*Sample v. Ballard*,
    860 F.3d 266 (4th Cir. 2017)...............................................40

*Schafer v. Am. Cyanamid Co.*,
    20 F.3d 1 (1st Cir. 1994) ....................................................27

*Shalala v. Whitecotton*,
    514 U.S. 268 (1995)......................................................*passim*

*Sibbach v. Wilson & Company,*
  312 U.S. 1 (1941) ...................................................... 86

*Sparks v. Oxy-Health, LLC,*
  134 F. Supp. 3d 961 (E.D.N.C. 2015) ...................................... 56

*Stegall v. Catawba Oil Co. of N. C.,*
  260 N.C. 459 (1963) .................................................... 55

*Stewart v. Sec'y of Health and Human Servs.,*
  No. 02-819V, 2003 WL 22300298 (Fed. Cl. Sept. 3, 2003) ........... *passim*

*Stone v. Instrumentation Lab'y Co.,*
  591 F.3d 239 (4th Cir. 2009) ............................................ 25

*Swedeen v. Swedeen,*
  270 Minn. 491 (1965) ................................................... 65

*Terran ex. rel. Terran v. Sec'y of Health & Human Servs.,*
  195 F.3d 1302 (Fed. Cir. 1999) ................................... *passim*

*Thomas on behalf of Z.T. v. Sec'y of Health & Human Servs.,*
  No. 20-886V, 2021 WL 2389837 (Fed. Cl. May 17, 2021) ................... 75

*Tillery Env't v. A & D Holdings,*
  2018 WL 802515 (N.C. Super. Feb. 9, 2018) ............................ 64-65

*Timmons v. White,*
  314 F.3d 1229 (10th Cir. 2003) ...................................... 29, 41

*U.S. v. Hatcher,*
  560 F.3d 222 (4th Cir. 2009) ............................................ 36

*United States v. George,*
  971 F.2d 1113 (4th Cir.1992) ............................................ 25

*Universal Health Servs., Inc. v. United States,*
  579 U.S. 176 (2016) .................................................... 65

*Wayman v. Southard,*
  23 U.S. (10 Wheat.) 1 (1825) ........................................... 86

## Statutes & Other Authorities:

U.S. Const., art. I, § 1 ................................................. 77

U.S. Const., art. I, § 7, cl. 2 ............................................................ *passim*

1986 U.S.C.C.A.N. 6410 ........................................................... 71

2 U.S.C. § 691 ......................................................................... 78

2 U.S.C. § 691(a) .................................................................... 78

2 U.S.C. § 691(a)(3)(A) ........................................................... 79

28 U.S.C. § 1291 ....................................................................... 2

28 U.S.C. § 1332(a)(1) ............................................................... 2

28 U.S.C. §§ 2071-2077 ........................................................... 86

42 U.S.C. § 300a-14(c) ............................................................ 87

42 U.S.C. § 300aa-1 ............................................................ 3, 73

42 U.S.C. § 300aa-10 .............................................................. 17

42 U.S.C. § 300aa-11(a)(2) ................................................ *passim*

42 U.S.C. § 300aa-11(a)(2)(A) ................................................ 71

42 U.S.C. § 300aa-11(a)(2)(A)(ii) ........................................... 29

42 U.S.C. § 300aa-11(b) .......................................................... 17

42 U.S.C. § 300aa-11(c)(1)(B) ................................................ 18

42 U.S.C. § 300aa-11(c)(1)(C)(ii) ........................................... 19

42 U.S.C. § 300aa-12(b) .......................................................... 17

42 U.S.C. § 300aa-12(d) .......................................................... 17

42 U.S.C. § 300aa-12(d)(3) ...................................................... 17

42 U.S.C. § 300aa-12(g) .......................................................... 17

42 U.S.C. § 300aa-14 ......................................................... 20, 71

42 U.S.C. § 300aa-14(a) .................................................... *passim*

42 U.S.C. § 300aa-14(c) ..................................................... 85, 88

42 U.S.C. § 300aa-14(c)(3) .................................... 20, 72, 75, 76

42 U.S.C. § 300aa-14(e) ..................................................... 72, 76

42 U.S.C. § 300aa-14(e)(1) ............................................................. 75

42 U.S.C. § 300aa-14(e)(2) ............................................................. 75

42 U.S.C. § 300aa-14(e)(3) ............................................................. 75

42 U.S.C. § 300aa-16(a)(2) ............................................. 19, 31, 71

42 U.S.C. § 300aa-16(c) .......................................................... 19, 32

42 U.S.C. § 300aa-21 ..................................................... 17, 21, 32, 42

42 U.S.C. § 300aa-21(a) ......................................................... 29, 48

42 U.S.C. § 300aa-21(c) ......................................................... 32, 33

42 U.S.C. § 300aa-22(b)(2) .................................................... 53, 54

42 U.S.C. § 300aa-22(c) ............................................................... 62

42 U.S.C. § 300aa-22(e) ............................................................... 54

42 U.S.C. § 300aa-23(d)(2) .................................................... 53, 54

42 U.S.C. § 300aa-23(d)(2)(B) ...................................................... 67

42 U.S.C. § 300aa-23(d)(2)(C) ...................................................... 67

42 U.S.C. § 300aa-23(e) ........................................................ 35, 36

42 U.S.C. § 300aa-26 ......................................................... 9, 10, 12

42 U.S.C. § 300aa-33 ................................................................... 19

42 U.S.C. § 300aa-33(3) ............................................................... 19

42 U.S.C. § 300aa-33(5) ........................................................ 19, 71

47 U.S.C. § 300aa-14(c)(3) ........................................................... 75

47 U.S.C. § 300aa-14(e)(1) ........................................................... 75

47 U.S.C. § 300aa-14(e)(2) ........................................................... 75

47 U.S.C. § 300aa-14(e)(3) ........................................................... 75

42 U.S.C. § 300aaa-14(c) .............................................................. 24

42 U.S.C. § 300aaa-14(e) .............................................................. 24

42 C.F.R. § 100.3 ................................................................... 20, 84

42 C.F.R. § 100.3(a) ................................................................. 74

Fed. R. Civ. P. 9(b) ................................................................. 68

Fed. R. Civ. P. 12(c) ........................................................ *passim*

Fed. R. Evid. 105 .................................................................... 59

Fed. R. Evid. 210 .................................................................... 59

Fed. R. Evid. 351 .................................................................... 59

H.R. Rep. 99-908 ................................................... 16, 17, 73

H.R. Rep. 99-980 .................................................................... 18

N.C. GEN. STAT. § 99B-1.1 ................................................... 55

N.C. GEN. STAT. § 99B-5 ...................................................... 55

N.C. GEN. STAT. § 99B-5(a) ................................................. 56

Oregon Revised Statutes § 12.160 ..................................... 31

60 Fed. Reg. 7678-01 ............................................................ 71

72 Fed. Reg. 19937-01 ........................................ 20-21, 71, 76

Pub. L. 99-660 ....................................................................... 20

Pub. L. 99-660 § 2114 .................................... 20, 71, 76, 84

Pub. L. 99-660, Title III, § 311 ......................................... 76

Pub. L. 99-660, Title III, § 322 .................................... 24, 73

Pub. L. 103-66, 107 Stat. 312, § 13632 ............................ 76

Pub. L. 109-432, § 408(b) .................................................... 76

Betsy J. Gray, *The Plague of Causation in the Nat'l Childhood
    Vaccine Injury Act,* 48 HARV. J. ON LEGIS. 343 (2011) ........................... 74

Brandon L. Boxler, *Fixing the Vaccine Act's Structural Moral
    Hazard*, 12 PEPP. DISP. RESOL. L.J. 1 (2012) ........................................ 74

Jamie J. Sack, *"One Less" Avenue of Recovery?: The Treatment of
    Gardasil under the Nat'l Vaccine Injury Compensation
    Program*, 19 FED. CIR. B.J. 663 (2010) ................................................ 74

Nora Freeman Engstrom, *A Dose of Reality for Specialized Courts: Lessons from the VICP*, 163 U. PA. L. REV. (2015)...................74

Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312, § 13632 .................................................................................76

Peter H. Meyers, *Fixing the Flaws in the Fed. Vaccine Inj. Comp. Program*, 63 ADMIN. L. REV. 785 (2011)...........................................73, 74

Restatement (Second) of Torts, § 529 (1976)...........................................66

Statement of Pres. Ronald Reagan upon Signing S. 1744, 22 Weekly Comp. Pres. Doc. 1565................................................................71

# JURISDICTIONAL STATEMENT

Plaintiffs with claims against Defendants/Appellees Merck & Company, Inc. and Merck Sharpe & Dohm LLC ("Merck") for injuries caused by Defendants' Gardasil vaccine moved for consolidation of their cases for pre-trial proceedings before the Judicial Panel on Multi-District Litigation ("JPML"). JA0133. The JPML granted their motion and transferred their cases to the Western District of North Carolina (Charlotte), No. 3:22-md-03036-KDB. *Id.* The district court then allowed new plaintiffs to file Gardasil complaints directly in the MDL. JA0177-0182.

Plaintiff-Appellant Tessa Needham ("Needham") filed her complaint in the MDL on March 8, 2024. JA0768-0864. Plaintiff-Appellant Angela M. Walker ("Walker") filed her complaint in the MDL on April 29, 2024. JA1017-1111. Plaintiff-Appellant Shanie D. Roman ("Roman") filed her complaint in the MDL on March 5, 2024. JA0671-0767. Roman, Needham, and Walker are citizens of Illinois, Oregon, and Wisconsin. JA0675; JA0772; JA1021. Merck's principal place of business is New Jersey. JA0676; JA0773; JA1022. Because the parties are citizens of different states and the amounts in controversy exceed

$75,000, the district court had jurisdiction. 28 U.S.C. § 1332(a)(1);

JA0678; JA0775; JA1024.

Merck moved to dismiss Needham's, Walker's, and Roman's

complaints. JA1139-1158. The district court granted Merck's motion on

July 31, 2024. JA1397-1410. The dismissal order disposed of all claims

by all parties.[1] *Id.* Needham and Walker timely filed notices of appeal

on August 28, 2024; Roman did so the next day. JA1517-1519; JA1520-

1522, JA1523-1525. The Court has appellate jurisdiction because it is

an appeal from the district court's final decision. 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Did the district court err by applying the filing deadline

applicable in the administrative Vaccine Injury Compensation Program

("VICP") to this civil action and by holding that a special master's

findings in Plaintiffs' VICP claims were binding when the Vaccine Act

expressly allows a plaintiff to reject a VICP decision and file a *de novo*

action in district court?

---

[1]    Plaintiffs have an individual right to appeal their claims even
though other MDL plaintiffs' claims have not been finally resolved.
*Gelboim v. Bank of Am. Corp.*, 57 U.S. 405, 413 (2015).

2.     Did the district court err by holding Merck was not required to provide accurate warnings or truthful information to consumers when it chose to advertise Gardasil by television advertising and other promotions aimed at the general public?

3.     Did the district court err when it struck Plaintiffs' allegations as relevant only to design defect claims that are barred by the Vaccine Act when these allegations were also relevant to Plaintiffs' failure to warn and fraud claims?

4.     Did the district court err by holding the National Childhood Injury Act ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 et seq. was constitutional when the statute included a Vaccine Table listing the vaccines and injuries covered by the Act, but the Act purported to allow the Secretary of Health and Human Services to amend the text of the statute to alter the vaccines and injuries covered by the Act without an act of Congress signed by the President, as required by the presentment clause of the United States Constitution, article I, section 7, clause 2?

## STATEMENT OF CASE

**I.    Statement of Facts**

Merck is a multinational pharmaceutical company that markets and sells the Gardasil vaccines. JA1024. Needham, Walker, and Roman ("Plaintiffs") received Gardasil when they were 10, 22, and 25 years old. JA0831, JA1079; JA0732. All later developed debilitating autoimmune diseases caused by Gardasil. JA0831-0832; JA1078-1080; JA0732-0735.

**A.    Merck seeks "fast-track" approval for Gardasil to replace the loss of its immensely profitable but dangerous drug Vioxx.**

Prior to Gardasil, Merck developed and sold several controversial products including Fosamax, NuvaRing, and most infamously the pain reliever Vioxx. JA1024-1025. Merck was eventually forced to cease sales of Vioxx because it caused cardiovascular injuries. JA1025. Tens of thousands of consumers of Vioxx recovered more than $4 billion from Merck for concealing the dangers of Vioxx. *Id*.

Vioxx was extremely profitable for Merck, and in 2005 when it was forced to pull Vioxx, Merck was desperate for a similarly profitable replacement. JA1027. Merck's senior director of clinical research, Eliav

Barr, M.D., proclaimed of Gardasil: "This is it. *This is the Holy Grail!*" *Id.*

In 2006, Merck petitioned the Food and Drug Administration ("FDA") for an expedited six-month "fast-track" approval process for Gardasil. JA1031. The FDA granted the petition, and Merck quickly introduced Gardasil to the market. *Id.* Despite Merck's knowledge that Gardasil can cause a constellation of autoimmune diseases, Merck concealed these dangers from the public and the FDA. JA1028.

Meanwhile, more than a year before the approval process began, Merck primed the market for Gardasil's launch. JA1036-1037. Merck unveiled a massive "disease branding" campaign to "educate" the public about Human Papilloma Virus ("HPV") and its links to cervical cancer. *Id.* Prior to Merck's campaign, only 40% of women had ever heard of HPV, and less than half of those knew of any association with cervical cancer. JA1036. After approval, Merck launched its "One-Less" advertising campaign warning parents to vaccinate their girls, so there would be "one less" victim of cervical cancer. JA1038.

In reality, Merck had never tested whether Gardasil prevented cancer, and given the short time period of testing could not possibly

5

have done so. JA1042-1043. The median age at which cervical cancer is diagnosed in the United States is 50, more than 39 years after the age when Gardasil is intended to be received. JA1031, JA1042-1043.

**B.    Merck falsely promoted Gardasil as a safe way to end cervical cancer when there is no proof it will eliminate cancer risk.**

The Pap test has proved highly reliable for cervical cancer screening, and its widespread use in the United States has caused a steady decline in cervical cancer. JA1030. Currently, only 0.8% of women will experience cervical cancer over their lifetimes while survival rates have also dramatically increased. *Id.*

HPV is ubiquitous in humans with more than 200 types. *Id.* For the most part, HPV is benign and asymptomatic. JA1029. Approximately 12-18 strains can sometimes lead to lesions which, if left untreated for prolonged periods of time, are correlated with cervical cancer. *Id.* Pap tests can detect these lesions allowing surgical removal. *Id.* Chronic untreated HPV lesions are only one of many factors correlated with cervical cancer. JA1029; JA1043-1044.

Gardasil as originally formulated was intended to improve resistance to just two of the 12-18 strains of HPV associated with

cervical cancer risk. JA1030. Following fast track review, the FDA

approved Gardasil for routine administration to all girls at age eleven.

JA1031.

Fast-track review should be reserved for "serious" conditions

imperiling "survival, day-to day functioning" or that "if left untreated,

will progress from a less severe condition to a more serious one" where

the proposed treatment is superior to existing treatments. JA1033. To

show that a vaccine increasing resistance to HPV met this standard,

Merck used fraudulent studies purporting to show Gardasil was

superior to Pap testing at reducing cervical cancer rates, and that HPV

infections inexorably lead to cervical cancer. JA1033-1034.

By 2010, the FDA had approved Gardasil for all males and

females aged 9 to 26. JA1032. In 2014, Merck introduced Gardasil 9

phasing out Gardasil. *Id.* Gardasil 9 purportedly improved resistance to

five additional HPV types. *Id.*

The FDA has now approved Gardasil 9 for administration to all

persons between 9 and 45 years old to prevent cervical, vaginal, anal,

oropharyngeal, and other head and neck cancers. *Id.* Between 2006,

when Gardasil went into widespread use, and 2017, the rates for annual

diagnosis of cervical cancer in the United States declined only slightly from 2.4 per 100,000 women to 2.2. *Id.*

## C.    Gardasil is immensely profitable for Merck.

Merck typically charges $450 for two doses of Gardasil. JA1077-1078. In contrast, venerable vaccines, like the diphtheria, pertussis, and tetanus ("DPT") vaccine, that prevent lethal childhood diseases, cost only about $25 a dose. JA1078.

In 2022, Merck generated $6.9 billion selling Gardasil. *Id.* Gardasil is Merck's most lucrative vaccine and its third-highest selling product. *Id.* Gardasil is so profitable and so important to its bottom line, Merck lists it as a "key product" in public financial reports. *Id.*

## D.    Gardasil causes debilitating autoimmune diseases.

There is a significant body of medical literature that shows Gardasil can cause serious autoimmune and neurological injuries and adverse symptoms, including postural orthostatic tachycardia syndrome ("POTS"), and the other diseases that afflict Plaintiffs. JA0733-0734; JA0831-0832; JA1080-1081 (collecting articles).

**E.** **Plaintiffs Needham, Roman, and Walker.**

Needham was just ten years old when her doctor convinced her mother to consent to her Gardasil vaccine. JA0831. Her first dose was December 14, 2014, her second February 17, 2015, and her third July 14, 2015. JA1147; *Needham v. Sec'y of Health & Hum. Servs.*, No. 23-630V, 2023 WL 9287882, at *1 (Fed. Cl. Dec. 20, 2023). Needham's doctor relied on Merck's representations that Gardasil was a safe and effective method for preventing cervical cancer when recommending it. JA0831. Although required to do so by law, her doctor did not provide Needham or her mother with a Vaccine Information Statement ("VIS") informing her of the VICP. JA0834; 42 U.S.C. §§ 300aa-26.

After receiving Gardasil, Needham began to experience frequent headaches, nausea, chronic fatigue, lightheadedness, dizziness, fainting, racing heart and palpitations, chest pain, difficulty breathing, vision loss, somnolence, difficulty sleeping, muscle weakness, sensitivity to noise, light, and sleep overheating, joint pain, discoloration of her skin, shooting pain in her calves and feet, hand tremors, and difficulty concentrating. JA0831. She eventually was diagnosed with POTS. JA0831. Needham has become unable to engage in normal activities,

and her academic performance, extracurricular activities, and dreams for the future have been crushed. JA0831-0832.

None of the healthcare providers she saw for her symptoms suggested that Gardasil might have any role in causing them. *Id.* At the age of nineteen, in early 2003, Needham discovered on her own that Gardasil was a possible cause. JA0831. Within months of first learning of a possible connection between her injuries and Gardasil, Needham filed a petition in the VICP. JA0834. The order concluding her VICP proceedings was entered on February 8, 2024, and she promptly filed her complaint in the district court on March 8, 2024. JA0768; JA1163.

Roman was 25 years old when her doctor advised her to be vaccinated with Gardasil to safely and effectively prevent cervical cancer. JA0732 Roman received a second dose when she was 26. *Id.* Roman's doctor relied on Merck's representations that Gardasil was a safe and effective method for preventing cervical cancer. *Id.* Although required to do so by law, her doctor never provided Roman with a VIS. JA0736; 42 U.S.C. §§ 300aa-26.

Following her last Gardasil vaccination, Roman started experiencing excruciating pain prior to and during menstruation.

JA0733. She was eventually diagnosed with endometriosis and underwent a partial hysterectomy. *Id*. She was later diagnosed with fibromyalgia, ovarian remnant syndrome, pseudotumor cerebri, and pelvic floor syndrome. JA0733-0734. Roman's symptoms worsened and she became unable to work, stand for any length of time, or enjoy activities with her daughter. JA0733. Roman was treated by numerous doctors but none advised her that her symptoms could have been caused by Gardasil. *Id*.

Roman first learned that her symptoms might have been caused by Gardasil on her own in early 2023. *Id*. Soon thereafter, she filed a petition in the VICP, and the order concluding her proceedings was issued on January 5, 2024. JA0736. She filed her complaint in this case on February 8, 2024. *Id*.

In 2008, when Walker was twenty-two years old, her doctor advised her to receive the Gardasil vaccine because it was a safe and effective method to prevent cervical cancer. JA1077-1078. On the advice of a second doctor, Walker received a second dose in 2009. *Id*.

In August 2015, a third doctor notified Walker that she should schedule an appointment for a third dose. *Id*. Walker followed her

doctor's instructions and received a third dose on August 14, 2015. *Id.*
Walker's doctors relied on Merck's representations that Gardasil was
safe and effective when recommending it. *Id.* Although required to do so
by law, none of her doctors provided Walker with a VIS. JA1082; 42
U.S.C. §§ 300aa-26.

After receiving her third dose, Walker began to experience
extreme fatigue, dizziness, passing out and falling, insomnia, brain fog,
difficulty walking distances, difficulty concentrating and remembering,
and severe chronic headaches. JA1079. Walker sought treatment from
numerous doctors, but none of them advised her that her symptoms
could have been caused by Gardasil. *Id.* Walker's symptoms worsened
until she became mostly bed-ridden and had to end her career as a chef.
*Id.* In November 2016, Walker was diagnosed with chronic fatigue
syndrome, autonomic dysfunction, and symptoms consistent with
POTS. *Id.*; JA1152.

Walker first learned her symptoms might have been caused by
Gardasil on her own in early 2023. JA1079. She promptly filed a
petition in the VICP, and the order concluding her VICP proceedings

was issued on March 4, 2024. JA1082-1083. She filed her complaint in this case on April 29, 2024. JA1017.

## II. The Course of Proceedings Below.

Plaintiffs with Gardasil claims in various federal courts moved the JPML for an order consolidating those claims in one court. JA0133-0139. On August 4, 2022, the JPML granted their motion and ordered all Gardasil cases assigned to the Honorable Robert J. Conrad, Jr. in the Western District of North Carolina. JA0135.

On February 7, 2023, Defendants moved for partial judgment on the pleadings on the Bergin and America complaints only, arguing the Vaccine Act barred some of their claims. JA0186-00209. Bergin and America responded on March 9, 2023, and Defendants filed a reply. JA0364-0391; JA0646-0699. Meanwhile, the parties engaged in over a year of extensive discovery, including motions, production of detailed fact sheets, written discovery, document production, and depositions. JA0099-0132.

On February 2, 2024, the MDL was reassigned to the Honorable Kenneth D. Bell. JA0670. On February 28, 2024, Judge Bell set the

motion for judgment on the pleadings against Bergin and America for hearing on March 11, 2024. JA0115; JA0914-0987.

Nine days later, Judge Bell issued an order granting in part and denying in part Merck's motion. JA0865-0891. The order stated that it would apply to <u>all</u> plaintiffs (including those filing in the future), but gave plaintiffs who objected to its application across the MDL thirty days to move that it should not. JA0873 n.9.

Plaintiffs moved to limit application of the March 20, 2024 order arguing that the Vaccine Act is unconstitutional because it allowed amendment to the statutory text by the Secretary of Health and Human Services ("HHS") without being passed by both houses of Congress in violation of the presentment clause of the Constitution, art. I, section 7, clause 2. JA0988-1016.

Meanwhile, Plaintiffs Roman, Needham, and Walker filed their complaints directly in the MDL. JA0671; JA0768; JA1017. On May 14, 2024, Defendant moved to dismiss Roman's, Needham's, and Walker's complaints as untimely under the Vaccine Act. JA1136. Plaintiffs responded. JA1334-1366.

On June 27, 2024, without oral argument, the district court denied

Plaintiffs' constitutional challenge. JA1367-1377. On July 31, after

briefing and argument, the district court granted the motion to dismiss

Roman's, Needham's, and Walker's complaints. JA1397-1410.

Roman, Needham, and Walker timely filed notices of appeal

contesting the district court's: (1) March 20, 2024 Order granting in

part Defendants' motion for judgment on the pleadings; (2) June 27,

2024 Order denying Plaintiffs' motion to find the Vaccine Act

unconstitutional; and (3) July 31, 2024 order dismissing their

complaints. JA1517-1519; JA1520-1522; JA1523-1525.

## III.   The Vaccine Act.

The district court applied the Vaccine Act to first limit, and then

dismiss Plaintiffs' claims. JA0875; JA1367-1368; JA1397-1398.

> **A.    The Vaccine Act intended to create a quick, easy, and generous no-fault compensation system, so children injured by vaccines could receive compensation from the HHS and have less incentive to sue vaccine manufacturers.**

The 1986 Vaccine Act was aimed at addressing a national crisis

that had arisen because "previously unrecognized injuries associated

with vaccines ha[d] become more widely known" causing "a small but

15

significant number [of children to] have been gravely injured" resorting to the "tort system" for compensation. H.R. Rep., 99-908, at 4 (1986). Faced with rising lawsuits concerning the DPT vaccine, manufacturers were struggling to find insurance to cover their legal exposure, potentially endangering reliable sources for essential vaccines. *Id.*, at 6-7. At the time, traditional childhood vaccines such as DPT were not very lucrative to manufacture, and novel and highly profitable vaccines like Gardasil that do not prevent lethal or crippling childhood diseases were unknown. *Id.*

The Act intended to strike a balance that would ensure a reliable supply of childhood vaccines while also providing a "no-fault compensation program" to provide relief to those injured by vaccines "faster and with greater ease than the civil tort system." *Bruesewitz v. Wyeth, LLC*, 562 U.S. 223, 228 (2011) (quoting *Shalala v. Whitecotton*, 514 U.S. 268, 269 (1995)). The idea was to provide "awards … to vaccine-injured persons quickly, easily, and with certainty and generosity." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir, 1994); *see also Figueroa v. Sec'y of Health & Human Servs.*, 715 F.3d 1314, 1317 (Fed. Cir. 2013) (noting that Congress

16

intended the Vaccine Act "to compensate injured persons quickly and fairly").

To provide compensation, the Act authorized the Secretary of HHS to establish the VICP. 42 U.S.C. § 300aa-10. The Act requires those injured by covered vaccines to first file petitions seeking compensation in the VICP before bringing a civil action against the vaccine manufacturer. *Id.*, §§ 300aa-11 (a) (2), (b), 300aa 12(b). Vaccine manufacturers do not participate in the VICP, HHS is represented by the Department of Justice, and the parties do not conduct discovery. 42 U.S.C. §§ 300aa-11(a)(2), 300aa-12(d)(3). Petitions are heard by special masters within the Court of Federal Claims. 42 U.S.C. § 300aa12(d).

## B. The VICP is not binding, and petitioners may opt-out and pursue a *de novo* civil action.

The Act expressly allows petitioners to opt-out of the VICP. 42 U.S.C. §§ 300aa-12(g), § 300aa-21. Petitioners can opt-out after 240 days without a judgment or, after judgment is entered, may opt-out by rejecting it. In either case, they then can pursue a *de novo* civil action against the vaccine manufacturer. *Id.*, H.R. Rep. 99-908, at 12 ("the bill does not prohibit a vaccine-injured person who has completed compensation proceedings from going on to court"); *Shalala*, 562 U.S. at

17

269 (The Vaccine Act allows a petitioner to reject the result and pursue a "*de novo* civil action").

Petitioners who elect to accept a VICP award are paid by HHS from a fund collected from taxes on covered vaccines. H.R. Rep., 99-980, at 3. Congress intended the VICP to be sufficiently generous to those injured by vaccines to reduce civil actions against vaccine manufacturers but also wished to preserve the rights of vaccine-injured children to pursue actions in court without being compromised by events in the VICP. *Id.*, at 4, 12-13.

### C. The Act's Vaccine Table determines the vaccines subject to the Act and the injuries that are presumptively compensable in the VICP.

 "Unlike in tort suits, claimants under the Act are not required to show that the administered vaccine was defectively manufactured, labeled, or designed." *Bruesewitz*, 562 U.S. at 229. Instead, the Act included a Vaccine Injury Table listing vaccines and corresponding injuries that are compensable if occurring within temporal limits. *Bruesewitz*, 562 U.S. at 228; 42 U.S.C. § 300aa-14(a). Table injuries are presumptively entitled to compensation without proof beyond evidence of the injury and its time of onset. *Id.*, § 300aa-11(c)(1)(B).

18

Alternatively, petitioners can recover for non-Table injuries by proving "causation." 42 U.S.C. § 300aa-11(c)(1)(C)(ii). Only vaccines listed on the Table are subject to the VICP. 42 U.S.C. §§ 300aa-11(a)(2), 300aa-14(a), 300aa-33(3), (5). An injured party is free to immediately pursue tort remedies against the manufacturer for any vaccine not included on the Table. *Id.* at § 300aa-33 (definitions making clear that the only vaccines subject to the Act are those included on the Table).

### D.    The Act's three-year timing requirement.

The Act requires those injured by vaccines to file petitions within "36 months after the date of the occurrence of the first symptom or manifestation of onset or the significant aggravation of such injury." 42. U.S.C. § 300aa-16(a)(2). Filing a petition tolls "limitations of actions under State law" until the petitioner elects to "withdraw the petition." *Id.* §16(c). The Federal Circuit has held the Act's three-year timing requirement is subject to equitable tolling but not a discovery rule. *Cloer v. Sec'y of Health & Human Servs.,* 654 F.3d 1322, 1337, 1344 (Fed. Cir. 2011). No other Circuit Court or the Supreme Court has addressed these issues.

### E.    The Act provides if any part is unconstitutional, the entire Act is unconstitutional.

The Act was first passed in 1986, and includes a nonseverability clause stating, "If any provision of this title or the application of any provision of this title to any person or circumstance is held invalid by reason of violation of the Constitution, the entire title shall be held invalid." Pub. L. No. 99-660. The Act included a Vaccine Injury Table in the text of the statute itself. Pub. L. 99-660 § 2114 (codified at 42 U.S.C. § 300aa-14).

The section creating the statutory Table purported to give the Secretary of HHS the power to amend the Table. 42 U.S.C. § 300aa-14(c)(3) (1989). The statutory Table remains unaltered in the Act as originally passed by Congress and signed by President Reagan. 42 U.S.C. § 300aa-14(a). The Secretary has, however, created an entirely new vaccine injury table by administrative action that purports to repeal and replace the statutory Table. *Compare* 42 U.S.C. § 300aa-14(a) *with* 42 C.F.R. § 100.3. The Secretary added Gardasil to the regulatory Table in 2006 but included virtually no Table injuries. National Vaccine Injury Compensation Program: Addition of

Meningococcal and Human Papillomavirus (HPV) Vaccines to the
Vaccine Injury Table, 72 Fed. Reg. 19937-01 (Apr. 20, 2007).[2]

## SUMMARY OF ARGUMENT

The district court's order resulting in the dismissal of Plaintiffs'
claim should be reversed. The district court applied the Vaccine Act to
improperly dismiss certain factual allegations in Plaintiffs' Complaints
and incorrectly find Plaintiffs' claims were untimely as a matter of law.
The district court should be reversed because it misconstrued the
Vaccine Act, and the Vaccine Act is unconstitutional and inapplicable in
any event.

The Vaccine Act was designed to provide swift, easy compensation
to those injured by covered vaccines. *See Figueroa*, 715 F.3d at 1317 The
Federal Circuit requires that it be applied with generosity and
mandates that close calls be resolved in favor of claimants. *See, e.g.*,
*Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325-26
(Fed. Cir. 2006) (describing the system created by Congress as one "in
which close calls regarding causation are resolved in favor of injured

---

[2]    The Secretary's Table lists only "Anaphylaxis … ≤4 hours …
Shoulder Injury Related to Vaccine Administration … ≤ 48 hours …
Vasovagal syncope [fainting] … ≤1 hour." 42 C.F.R. § 100.3.

claimants"); *Knudsen*, 35 F.3d at 549. As explained below, the Vaccine Act does <u>not</u> replace traditional tort litigation; rather, it expands the options available to injured claimants to seek relief for their vaccine injuries.[3] *See Stewart*, 2003 WL 22300298, at *13 (noting that "Congress designed the [VICP] as an alternative to tort litigation against vaccine manufacturers and administrators").

Any application of the Vaccine Act that forever extinguishes the rights of a thirteen-year-old child, as is the case for Plaintiff Needham under the district court's analysis, must be contrary to the remedial purposes Congress had in mind when it established the VICP. *See Atchison*, *Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987) (stating that remedial legislation should be given a liberal interpretation to further its beneficent and humanitarian purposes). This is particularly true when under the laws of just about every state – and certainly the laws of her home state – this child would have been

---

[3]    There is, of course, an expectation that the VICP will lessen the burden of civil lawsuits against vaccine manufacturers, as many claimants will be satisfied with their recovery in the VICP and, as a result, will never seek further relief with a civil action.  *See Stewart v. Sec'y of Health and Human Servs.*, No. 02-819V, 2003 WL 22300298, at *13 (Fed. Cl. Sept. 3, 2003) (explaining Congress' "hope[]" that not all claimants would choose to file a civil action after the VICP).

free to pursue her claim once she became an adult. Yet, the district court, contrary to stated congressional intent, was quick to apply the Vaccine Act in the most restrictive way possible, forever barring Plaintiffs from pursuing their claims.

Put simply, the district court erred in applying the Vaccine Act incorrectly and unfairly. Even if its improper application of the Vaccine Act is set aside, the district court still erred by giving impermissible deference to a VICP special master. Plaintiffs' civil actions stand alone and can be neither barred nor bound by anything that happened in the VICP. Because it held otherwise in numerous respects, the district court should be reversed, and this matter should be remanded.

The district court also erred by entering judgment on the pleadings against particular factual allegations in Plaintiffs' Complaints. First, the district court was procedurally wrong because a motion for judgment on the pleadings cannot be aimed at particular factual allegations within a claim. *BBL, Inc v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). Second, the district court erred because the factual allegations, such as allegations about Gardasil's ingredients, were relevant to Plaintiffs' negligence and failure to warn claims on

23

which Merck did not move for judgment. *See, e.g.*, *Davis v. Wyeth Lab'y's, Inc.*, 399 F.2d 121, 127 (9th Cir. 1968) (ingredients of vaccine relevant to failure to warn claim). Furthermore, the district court erred by holding that Merck was entitled to judgment as a matter of law on Plaintiffs' allegations that Merck's deceptively advertised Gardasil because Merck undertook a duty to tell the full truth by choosing to publicly advertise directly to consumers to increase its sales. *See Ragdsale v. Kennedy*, 286 N.C. 130, 139 (1974).

Finally, the district court erred by finding the Vaccine Act is constitutional. The Vaccine Act purports to allow the Secretary to amend the Act's statutory Vaccine Table, without any action by Congress. 42 U.S.C. §§ 300aaa-14(c), (e). The Constitution's presentment clause prohibits the Executive Branch from unilaterally altering the text of a statute. Const. art. I, § 7 cl. 2; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *Terran ex. Rel. Terran v. Sec'y of Health & Human Servs.*, 195 F.3d 1302, 1312-1314 (Plager, J. dissenting). The Vaccine Act also contains a nonseverability clause. Pub. L. No. 99-660, Title III, § 322. Consequently, the provisions that

violate the presentment clause cannot be severed to save the rest of the Act, and it is void in its entirety.

## STANDARD OF REVIEW

The district court's order granting in part Defendants' motion for partial judgment on the pleadings, denying Plaintiffs' motion to find the Vaccine act unconstitutional, and granting Defendant's motion to dismiss plaintiffs' claims were all based on the pleadings. As such, the standard of review on appeal is *de novo. Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (Rule 12 motions to dismiss and motions for judgment on the pleadings are both reviewed *de novo* on appeal). "*[D]e novo* review entails consideration of an issue as if it had not been decided previously." *United States v. George,* 971 F.2d 1113, 1118 (4th Cir.1992) (quoting *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 246 (4th Cir. 2009)). On a Rule 12 motion, the court "accept[s] all factual allegations as true and draw[s] reasonable inferences in the plaintiff's favor. *Guerrero v. Ollie's Bargain Outlet, Inc.*, 115 F.4th 349, 353 (4th Cir. 2024).

**ARGUMENT**

A congressional Act designed to provide an expanded path to compensate vaccine-injured kids, read to permanently bar a thirteen-year-old from seeking redress for her injuries, is a sure sign of application run amok. When that same Act, narrowly tailored to originally cover only certain childhood vaccines and to preserve tort remedies against manufacturers, is given sweeping effect to broadly limit claims, something is greatly amiss. Yet that is exactly what has happened here. As set out above, the Vaccine Act was meant to facilitate expedient compensation. It was intended to have narrow application and to preserve the injured party's right to pursue tort remedies if unsatisfied with the VICP process. The district court's application in each of the orders in this appeal is contrary to statutory purpose. This Court, however, can recognize the Act's proper function consistent with original congressional intent.

## I.    Proper Application of the Vaccine Act Allows Plaintiffs to Pursue Their Tort Claims Against Merck.

Errors abound in the district court's order dismissing Plaintiffs' complaints, all attributable to a fundamental misunderstanding of the VICP's purpose and function. Despite clear congressional and statutory

intent to preserve tort claims with a *de novo* action, the district court found that dismissal for untimeliness in the VICP likewise barred Plaintiffs' tort claims. There are two paths to a proper outcome—allowing Plaintiffs to pursue their tort remedies in court—with the district court missing both in favor of impermissible deference to the VICP special master. First, the court could have applied the statutory system as written and given effect to both the words and intent of the Act. Second, the court could have provided *de novo* review, analyzing timeliness on a full record including discovery from the manufacturer. With the district court having done neither, this Court should give effect to congressional intent and the words of the Act to allow Plaintiffs' claims to proceed.

## A. The district court erred in interpreting and applying the Vaccine Act

### 1. The VICP, properly explained

The VICP is a no-fault system designed to provide quick and easy compensation to those injured by covered vaccines. *See Bruesewitz*, 562 U.S. at 228. Although the Act purports to require a VICP petition before suit is filed in court, *see id.* § 11(a)(2), the VICP is <u>not</u> a substitute for the traditional tort system. *See Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 3 (1st Cir. 1994) (Vaccine Act does not eliminate the tort system);

*Stewart*, 2003 WL 22300298 at *13 ("Congress designed the [VICP] as an alternative to tort litigation."). It is, in essence, a box the injured party must check before pursuing traditional tort remedies. While many choose a substantive remedy with compensation through the VICP, it is not a requirement. This fact was recognized and explained in *Stewart*:

> Congress designed the Program as an alternative to tort litigation against vaccine manufacturers and administrators. Congress did, undoubtedly, generally intend that each Program petitioner would obtain from the Program an evaluation of his or her claim of vaccine-related injury. Congress certainly hoped that any claimant receiving a Program award…would accept such award and thereby forego…a tort suit, and also hoped that many claimants who were denied Program awards would nevertheless be satisfied with that 'day in court' and…dissuaded from filing tort suits. However, Congress did not make the Program the exclusive remedy for vaccine-related injuries. Instead, Congress designed the Program to give any claimant who was dissatisfied with the size of a Program award, or who failed to obtain a Program award, the option to reject the Program verdict and to thereafter file a civil action against the vaccine manufacturer or administrator. Congress also [gave] a petitioner the option to exit the Program even prior to an actual ruling on the petitioner's claim, after 240 days. It is these latter two features of the Program, specifically designed by Congress, that combine to create the 'loophole' that respondent perceives. That is, Congress designed a system in which a claimant in fact may…enter and exit the Program without having made a true effort to prove that his injury was vaccine-caused. A claimant may…merely treat the Program as a 240-day delay before filing a tort suit, without giving the assigned special master a true opportunity to evaluate the merits of the claim.

*Stewart*, 2003 WL 22300298 at *13-14 (cleaned up).

Thus, a claimant may reject any VICP decision and pursue a civil action against the manufacturer. 42 U.S.C. §§ 300aa-11(a)(2), 21(a). Or, a claimant who thinks the VICP process takes too long may wait 240 days, withdraw her petition, and file a civil action. *Id.* §§ 300aa-11(a)(2)(A)(ii), 21. A claimant need not even make an effort to prove her VICP claim. *See DeConstanzo*, 643 F. Supp. 3d. at 349. She may instead "treat the [VICP] as a 240-day delay before filing a tort suit, without giving the assigned special master a true opportunity to evaluate the merits of the claim." *Id.* This ability to exit the VICP in favor of pursuing tort remedies is a critical aspect of the Vaccine Act.[4]

*DeConstanzo v. GlaxoSmithKline PLC*, 643 F. Supp. 3d. 340, 349 (E.D.N.Y. 2022) (ability to file a lawsuit after exiting the VICP is not a loophole, but a purposeful feature, created by design).

---

[4]    Many federal programs with administrative remedies feature opt-out provisions. *See, e.g.*, *Timmons v. White*, 314 F.3d 1229, 1233-34 (10th Cir. 2003) (federal employees alleging employment discrimination can opt out of administrative process for *de novo* civil action); *RXD Media, LLC v. IP Application Dev.*, 377 F. Supp. 3d 588, 591 (E.D. Va. 2019) (dissatisfied party before the Trademark Trial and Appeal Board "may either appeal…or commence a *de novo* civil action in…court").

The VICP has no gatekeeping function and was never intended to limit a petitioner's ability to file a civil action against the vaccine manufacturer. *Stewart*, 2003 WL 22300298 at *13-14. Rather, as *Stewart* confirmed, once a petitioner exits the VICP—by rejecting a special master's decision or by waiting 240 days—she can file a "new" civil action against the manufacturer. *Id. See also DeConstanzo*, 643 F. Supp. 3d. at 349 ("[A] petitioner who loses in [the VICP] may reject the verdict and then file a new action in federal court."). As explained below, this new civil action is divorced from the VICP proceeding. The trial court does not review VICP decisions; nothing in the VICP bars or binds the trial court; and the trial court cannot remand to the VICP. The new civil action is just that—new.

### 2.    The VICP, properly applied.

### a.    Plaintiffs' path to filing civil actions.

Plaintiffs followed similar routes to the MDL; their claims were treated similarly by the VICP and the district court. Without limitation, Ms. Needham is used as an example here.

 Ms. Needham suffered inexplicable pain and exhaustion soon after vaccination—which were only recently connected to Gardasil.

30

JA828. The VICP requires a claimant, even a minor who does not know her injury's cause, to file within three years of the "first symptom or manifestation of onset" of a vaccine injury. 42 U.S.C. § 300aa-16(a)(2). Ms. Needham's first symptom occurred when she was ten.[5] JA1393. To check the VICP box, Ms. Needham submitted her petition on May 2, 2023. *Id.* When the VICP questioned this timing, Ms. Needham argued for equitable tolling. JA1394. Dismissing the petition on December 20, 2023, the assigned special master rejected the argument and found that the three-year VICP filing period expired when she was a child of thirteen, years before she knew her puzzling symptoms were caused by Gardasil. *See Needham*, 2023 WL 9287882. As she is entitled to do, on February 8, 2024, Ms. Needham rejected the dismissal and elected to pursue a civil action, JA1394, which she filed directly in the MDL on March 8, 2024.[6] JA765-861.

---

[5] In contrast to the VICP time period, her home state statute of limitations is tolled for minority. *See* Oregon Revised Statutes § 12.160.

[6] Ms. Walker received her final Gardasil dose on August 14, 2015 and filed her VICP petition on July 5, 2023. JA1391-1404. Her petition was dismissed as untimely on February 29, 2024. *Id.* She rejected this dismissal and filed her complaint on April 29, 2024. *Id.* Ms. Roman received her final Gardasil dose on September 17, 2009 and filed her VICP petition on May 12, 2023. *Id.* Her petition was dismissed as

### b. The VICP can properly operate only one way.

In accordance with *Stewart*, the VICP can operate only one way—as a first step prior to an option of civil action. If the petition is within three years of her first symptom, a claimant can pursue a VICP award <u>or</u> she can treat the VICP as a delay. *Stewart*, 2003 WL 22300298 at *13-14. If treating the VICP as a "delay," she can opt out after 240 days, *see* 42 U.S.C. § 300aa-21, or, she can reject a VICP decision and file a lawsuit. *Id.* Saying nothing about timing, *Stewart* provides "any claimant…who failed to obtain a VICP award" may file a civil action. *Id.* Plaintiffs are in that group.

Once Plaintiffs filed in civil court, the salient question should have been whether the VICP box was checked. The Vaccine Act makes that clear in section 21(c), which provides that a civil action against a different defendant—the manufacturer—must be filed within the time provided under the applicable state statute of limitations (with tolling while a VICP petition is pending). *See* 42 U.S.C. § 300aa-21(c) (incorporating the tolling provisions of § 16(c)). Congress could have

---

untimely on January 5, 2024.  *Id.*  She rejected this dismissal and filed her complaint on March 5, 2024.  *Id.*

incorporated all of section 16 into section 21, but did not, confirming its intent for the Act's three-year provision to apply in the VICP and for state law periods to apply otherwise. *See id.*

This statutory reading gives full effect to congressional intent. It cannot be that this Act, designed to broaden opportunities to compensate vaccine-injured parties, in fact cuts off all rights for an injured 13-year-old, as is true under the district court's order regarding Ms. Needham. When the Act expressly preserves an injured party's right to pursue tort remedies against the manufacturer, and when the applicable state limitations statute provides ample time for a minor to both apprehend and file her action, the harsh result of a three-year cut off is incongruent. As discussed below, the Federal Circuit has determined that the three-year timing provision is not jurisdictional. *See infra* at 40-41. Yet this non-jurisdictional provision is the excuse used to thwart the Vaccine Act's purposes and determine that a person, including a child, failing to file within that non-jurisdictional three-year period, is forever barred in every forum. It is often said about statutes of repose, which are inflexible and unyielding, that any harsh outcome is the result of legislative judgment against stale claims. *See First United*

*Methodist Church v. U.S. Gypsum Co.*, 882 F.2d 862, 866 (4th Cir. 1989). Such cannot be said of this harsh result. Instead, it is contrary to the well-recognized policy behind the Vaccine Act, an outcome that is supported by neither the language or purpose of the Act nor the public policies that Congress was seeking to reflect through it. Such an outcome should not stand.

Instead, this Court should recognize and give effect to the Act's statutory language. While section 16 provides a three-year period for filing against HHS, section 21 expressly provides that state statutes of limitation govern tort actions against manufacturers. Had Congress intended to cut off rights on a strict three-year time frame, it would have said so. It did the opposite. And the Act's word and intent—to broaden rather than narrow a claimant's options—should be given effect.

## B.  The district court erred when it refused to consider the timeliness of plaintiffs' petitions.

Even if this Court does not follow the first path to an outcome in keeping with congressional intent, a second path is available, which the district court failed to follow as well. Rather than applying the Vaccine Act's letter and intent, the district court treated Plaintiffs' lawsuit as a

34

request to review/reconsider the special master's timeliness determination. Having gotten off track with the needed analysis, it then refused the unrequested review, instead giving the special master incredible deference.

According to the district court, the "threshold issue" before it was "whether it has the authority and duty to reconsider (and potentially overrule) the [VICP's] decision on the timeliness" of Plaintiffs' petition. JA1397. The district court determined that "the decision as to the application of the Vaccine Act's limitations period…is properly decided by those special masters and their reviewing courts, the Court of Federal Claims and the Federal Circuit." *Id.* The district court then refused to "reconsider" the special master's timeliness ruling, *id.*, effectively holding that the special master's determination was binding. This deference to the special master's decision is contrary to law.

### 1.     The Vaccine Act compels a plenary civil action.

Under the Vaccine Act's plain terms, a petitioner may file a civil action by following the procedural steps to exit the VICP. Once a petitioner has made her election to sue the vaccine manufacturer, the subsequent civil action must proceed unaffected by the VICP. 42 U.S.C.

§ 300aa-23(e). The Vaccine Act is express on this point, stating at "<u>any</u> <u>stage</u> of a civil action," any "finding of fact or conclusion of law" from the VICP, a special master, or the United States Court of Federal Claims, "<u>shall not be admissible</u>." *Id.* (emphasis added). The district court attempted to avoid this requirement by concluding that "any stage of a civil action" really means "any stage of a trial."[7] JA1399 n.7. Had Congress intended subsection 23(e) to be limited to trials, it knew how to do so—evidenced by the fact that earlier subsections discuss stages of trial, yet Congress chose the words "any stage of a <u>civil action</u>" for subsection 23(e).[8] *Lynch v. Jackson*, 853 F.3d 116, 121-22 (4th Cir. 2017) (when Congress uses different words in the same statute, different meanings should apply).

---

[7]     The district court justified this alteration of statutory language by concluding, without support, that "stage" referenced the liability, general damages, and punitive damages stages of trial.  JA1399 n.7.

[8]     The heading of section 23, "Trial," does not alter the analysis.  A statutory title or heading "cannot limit the plain meaning of the text." *U.S. v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009).  The plain meaning of "any stage of a civil action" is not "any stage of a trial."

### 2. Multiple courts have recognized that a plenary civil action is required.

Numerous courts recognize that a subsequent civil action must be a separate process, untethered to any VICP rulings, findings, or decisions. *Case v. Merck & Co.*, No. 02-1779, 2002 U.S. Dist. Lexis 21486, at *22-23 (E.D. La. 2002) (regardless of any VICP decision, the court "will have to determine causation in any case" because the VICP resolution "does not control' court resolution). The neighboring Middle District of North Carolina has confirmed that VICP proceedings have no impact on the civil action. *See Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 915 (M.D.N.C. 2005) ( "[T]he Vaccine Act prohibited the district court's admission of the VICP's findings of fact, conclusions of law, final judgments, or any subsequent disposition on appeal."); *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 335 F. Supp. 2d 614, 635-36 (M.D.N.C. 2004) (VICP inquiries are independent of court inquiries such that the civil action "is in no way barred or bound" by the VICP's decision). In *Rohrbough v. Wyeth Labs.*, 916 F.2d 970 (4th Cir. 1990), this Court weighed in and agreed with keeping the subsequent civil action totally distinct from VICP proceedings. *Id.* at 976 n.12 (the VICP's causation

treatment "has no bearing on the issue of causation in this civil tort action").

These cases, and others like them, confirm that a VICP petitioner can lose with an adverse causation ruling—the ultimate substantive issue in a case—and that ruling will neither bar nor bind the trial court. *See Doe 2*, 335 F. Supp. 2d at 635-36; *see also DeConstanzo*, 643 F. Supp. 3d at 349. Stated another way, the VICP special master can find that the vaccine was <u>not</u> the cause of the petitioner's injury, dismiss the petition on that basis, and the petitioner can reject that determination for a complete do-over in a lawsuit against the manufacturer.[9] *Case*, 2002 WL 31478219, at *7. This is precisely the reason the Supreme Court used "*de novo*" to describe a subsequent civil action. *Shalala*, 524 U.S. at 270.

---

[9]    A complete do-over makes sense. Although the proceedings share an alleged vaccine injury, the issues as well as the applicable rules, procedures, and law are fundamentally distinct. The VICP is a no-fault proceeding with HHS as respondent. The manufacturer is not a party, its fault or liability is not involved, and there is no discovery. Conversely, the manufacturer's actions and their connection to the harm are the focus of tort claims.

### 3. The district court misapprehended its role.

It is illogical that a petitioner would be able to start from scratch with a civil action after losing on the merits in the VICP but would be bound by a special master's adverse ruling on timing. The Vaccine Act does not make this distinction, but that is precisely what the district court did here when it found that Congress intended for claimants to have an opportunity to elect a civil action, but "did not make the courts that tried those subsequent civil actions a reviewing court for the Vaccine Court's procedural rulings on timeliness, etc." JA1397. This passage shines a light on the district court's misapprehension of the proper operation of the VICP and its role in a subsequent civil action. Contrary to the district court's statements, no party asked for a remand to the VICP (which would not have been proper in a new civil action). JA1397-1399. Rather, with the Vaccine Act properly applied, the district court should have presided over a new civil action in which all VICP proceedings were irrelevant. *Doe 2*, 335 F. Supp. 2d at 635-36. By acting as if it had been asked to perform the function of an appellate

tribunal, the court revealed its deep misunderstanding of its proper role.[10]

The district court made a similar error when it sought to reshape the meaning of "*de novo*." According to the court, the Supreme Court in *Shalala* used "*de novo*" to describe a subsequent civil action, "not in the sense that it is a second bite at the same apple but because it is an entirely separate process in which different claims (under state torts law) are asserted." JA1398. As an initial matter, the sweeping deference given the special master is inconsistent with treating the civil action as a "separate" proceeding. And the district court's explanation of "*de novo*" is inconsistent with how that term has been applied. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (under a *de novo* process, "no form of…deference is acceptable"); *Sample v. Ballard*, 860 F.3d 266, 272 (4th Cir. 2017) (stating that "[b]y definition, *de novo* review entails consideration of an issue as if it had not been decided previously" such

---

[10]     Further demonstrating its misunderstanding, the district court similarly stated that it cannot be "an alternate forum for an appeal on the question of a Vaccine Court petition's timeliness."  JA1398. No one asked the district court to hear an appeal from the VICP—nor could any party have done so. The district court should have ignored the special master's decision and presided over these cases anew.

that "a party entitled to *de novo* review must be permitted to raise

before the court any argument…that it could have raised before");

*Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 n.1

(4th Cir. 2008) (*de novo* "signals no need to protect the primacy of

another decisionmaker").

> **4.    Other circuits have recognized that a civil action following an administrative process should be a separate proceeding.**

Although in the employment context, the Tenth Circuit has

considered the scope of *de novo* actions following a plaintiff's decision to

opt out of available administrative remedies. *Timmons*, 314 F.3d at

1233-34. The Court explained that a trial *de novo* was a "new trial on

the entire case—that is, on both questions of fact and issues of law—<u>as

if there had been no trial in the first instance</u>." *Id.* at 1233 (emphasis

added).

In *Doe v. U.S.*, 821 F.2d 694 (D.C. Cir. 1987), the District of

Columbia Circuit, sitting en banc, addressed the similar question of

whether "*de novo*," as used in the Privacy Act, "means something less

than what that expression generally signals." *Id.* at 697. Stating that

the term has "no different, diminished meaning in the context at hand,"

41

the Court held that "*de novo* means here, as it ordinarily does, a fresh, independent determination of the matter at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion." *Id.* at 697-98.

Although the Vaccine Act does not use the term "*de novo*," its provisions confirm that the subsequent civil action must be an entirely new process. And, of course, the Supreme Court has described this subsequent civil action as "*de novo*." *Shalala*, 524 U.S. at 270. Plaintiffs each lost in the VICP and rejected the special master's decision dismissing their petitions. JA1394. Accordingly, they are entitled to a brand-new civil action, handled by the district court as if the VICP proceedings never happened. 42 U.S.C. § 300aa-21; *DeConstanzo*, 643 F. Supp. 3d. at 349. In protecting and preserving the special master's decision on timeliness, the district court deprived Plaintiffs of their right to a *de novo* civil action.

### C. The district court erred when it deprived plaintiffs of their opportunity to establish equitable tolling.

Prior to 2011, there was no discovery rule or equitable tolling in the VICP. The timing requirement was rigid in its application, almost like a statute of repose. *Mills v. Gen Motors Corp.*, (unpublished) (table,

42

text in Westlaw) 120 F.3d 262 (4th Cir. 1997) (defining statute of repose as "an unyielding and absolute barrier that prevents a plaintiff's right of action even before [her] cause of action may accrue"). The law fundamentally changed after the Federal Circuit decided *Cloer*, 654 F.3d 1322, in 2011.

*Cloer* directly held that the timing requirement applicable in the VICP is <u>not</u> jurisdictional. In doing so, the Federal Circuit expressly overruled *Brice v. Sec'y of Health and Human Servs.*, 240 F.3d 1367 (Fed. Cir. 2001). This change in the law is significant because, after *Cloer*, equitable principles could be considered when evaluating the VICP timing requirement. *See Cloer*, 654 F.3d at 1340-41. *Cloer* was driven by intervening precedent from the Supreme Court that established an expectation that equitable principles be considered when applying federal statutes of limitation. *See id.* at 1341-44 (examining multiple decisions from the Supreme Court). After conducting a thorough analysis, *Cloer* determined that equitable tolling was properly considered under the Vaccine Act. *Id.* at 1340.

Virtually all the cases relied on by the district court pre-date *Cloer* and therefore give zero substantive consideration to equitable tolling.

43

They are based on outdated precedents, including decisions that have

been reversed, and shed no light on application of the filing deadline in

the VICP.  These cases include:

- *Goetz v. N.C. Dep't of Health & Human Servs.*, 203 N.C. App. 421,

  692 S.E.2d 395 (2010), cited at JA1395. *Goetz* predates *Cloer*,

  when equitable tolling was not permitted under the Vaccine Act.

  *Goetz's* overly rigid statute of limitations application, therefore,

  has no bearing here. *Goetz* also states that a less harsh application

  "would allow a claimant to circumvent the [VICP] by filing outside

  the federal limitations period but still within the state limitations

  period." *Id.* at 431-32, 692 S.E.2d at 402. As noted above, the VICP

  has no gatekeeping function and can be "circumvented" already by

  simply treating it as a 240-day delay before initiating a civil

  action. *See DeConstanzo*, 643 F. Supp. 3d at 349. The North

  Carolina Court of Appeals' concern is not a legitimate one.

- *Blackmon v. Am. Home Prod. Corp.*, 328 F. Supp. 2d 647 (S.D.

  Tex. 2004), cited at JA1396. *Blackmon* also predates *Cloer*, when

  the Vaccine Act filing deadline permitted no consideration of

  equitable principles. For this reason, there is no discussion of

44

equitable tolling in *Blackmon*, rendering the decision  inapplicable here.

- *McDonald v. Lederle Labs.*, 341 N.J. Super. 369, 775 A.2d 528 (Super. Ct. N.J. 2001), cited at JA1396-97. *McDonald*, too, was decided when equitable tolling was not permitted under the Vaccine Act.[11] *Id.* at 375 n.1, 775 A.2d at 532 n.1 (citing *Brice* and noting that equitable tolling not part of the analysis). Moreover, *McDonald* applied the mistaken premise that "[u]nless a petitioner is required to fully adjudicate a claim…, Congress's objectives will not be realized." *Id.* at 380, 775 A.2d at 535. As discussed above, the exact opposite is true. *See supra* at 37-40; *see also DeConstanzo*, 643 F. Supp. 3d at 349.

- *Hebern v. Am. Cyanamid Co.*, No. A-3063-09T1, 2011 WL 135779. 135779 (Super. Ct. N.J. Jan. 13, 2011), cited at JA1397. As with the others, *Hebern* predates *Cloer* and is inapplicable here. Equitable tolling was raised by the lower court and, as in *McDonald*, the New Jersey court concluded that it could not

---

[11]    The New Jersey state court in *McDonald* believed equitable tolling was not properly before it, 341 N.J. Super. at 372-73, 775 A.2d at 530, which was a recognition that it could not change Federal Circuit law.

change Federal Circuit law. *Id.* at *14 *Hebern* even noted that the *Cloer* appeal was pending, and the Federal Circuit had requested briefing on whether equitable tolling should be permitted. *See id.* at *13 n.3.

The district court referenced only <u>one</u> post-*Cloer* case in support of its ruling – *Powers v. Merck & Co.* – but cited two decisions from that matter, which was filed initially in 2016, dismissed, and refiled in 2017. *See* JA1397; JA1396. Notably, the 2016 *Powers* decision is unpublished and not available on Westlaw or Lexis. *See* JA1397 (citing docket entry for the 2016 *Powers* decision). It is an incompatible decision that gives impermissible deference to the special master and deprives the plaintiff of her *de novo* review. Moreover, no party in *Powers* ever raised equitable tolling before the trial court, so the issue was never considered beyond the VICP. For these reasons, *Powers* cannot support the district court's decision here.

At bottom, Plaintiffs were entitled to have the district court properly consider equitable tolling on a full record. Parties cannot issue discovery in the VICP, making it virtually impossible to develop facts to support equitable tolling in that forum. Here, however, Plaintiffs have

the benefit of discovery, including discovery into Merck's conduct, which is information that never could have been presented in the VICP. This civil action provides an opportunity to make a compelling showing on equitable tolling, and it is patently unfair for Plaintiffs to be strapped with the impact of the special master's decision when they had no such opportunity in the VICP. Furthermore, their showing on equitable tolling should have been considered under Fourth Circuit law. *In re Lowe's*, 517 F. Supp. 3d 484, 496 (W.D.N.C. 2021 ("In an MDL, the transferee court applies its own interpretation of federal law." (internal quote omitted). By refusing to consider equitable tolling, and giving ultimate deference to the VICP, the district court committed reversible error.

### D. The district court erred when it stated plaintiffs should have appealed to the Court of Federal Claims and federal circuit.

More than once in its order, the district court stated that Plaintiffs failed to appeal to the Court of Federal Claims and the Federal Circuit. *See* JA1394, 1397. Although factually accurate, these statements suggest that Plaintiffs' decision was incorrect or improper. *See id.* In doing so, the district court erred. The Vaccine Act is clear that a

47

petitioner who receives an adverse outcome has a choice: she may

appeal to the Court of Federal Claims and the Federal Circuit; or, she

may reject the adverse outcome and proceed with a civil action against

the manufacturer. 42 U.S.C. §§ 300aa-11(a)(2), 21(a) (noting the

sequencing and timing of an election to pursue a civil action, depending

on whether review is requested by the Court of Federal Claims). The

choice was theirs to make individually, and Plaintiffs should not be

chastised for electing to pursue a civil action.

## II.  The District Court erred in granting Defendant's Motion for Judgment on the Pleadings.

Merck's Rule 12(c) motion for judgment on the pleadings sought to

trim Plaintiffs' Negligence, Gross Negligence, Manufacturing Defect,

and Fraud claims.  JA0208. The district court partially granted the

motion, dismissing the Manufacturing Defect claim in its entirety[12] but

only certain *allegations* within the remaining claims.  JA0865-0891.

Specifically, as to negligence and failure to warn, the court seems to

have dismissed only *allegations* relating: (a) to Gardasil's ingredients;

---

[12]    Appellants are not appealing dismissal of the manufacturing defect claim.

48

(b) Merck's failure to adequately test, study and monitor the safety and efficacy of Gardasil; and (c) that Plaintiffs or their parents were deceived by Merck or otherwise not adequately warned. JA0878-0883.[13] On the fraud claim, the district court's ruling appears to dismiss *certain allegations* that Plaintiffs or their parents were deceived through exposure to Gardasil television advertisements. JA0886-0887. The district court committed *procedural* and *substantive* errors and should be reversed.

### A.    The District court erred *procedurally* by dismissing various *factual allegations* within claims on a Rule 12(c) motion.

Plaintiffs did not plead a "design defect" claim, but Merck moved for judgment on any "design defect" claims. JA0192. Plaintiffs argued in opposition that, just as a "court has no duty to 'conjure up unpled allegations' in order to bolster the plaintiff's chances of surviving a 12(b)(6) motion to dismiss," *see Fleet Credit v. Sion*, 893 F.2d 441, 444 (1st Cir. 1990), a district court should not conjure up unpled causes of

---

[13]    The district court's order cited to the Bergin Complaint's paragraphs 136-162, 422(a)-(k), and 422(u). (JA0393-0514).

action to grant a fallacious motion for judgment on the pleadings. JA0369.

Although design defect was not pled, the district court, nonetheless, accepted Merck's invitation and found *allegations* within *other* pled claims masquerading as design defect. The court, thus, granted Merck's motion by construing *certain allegations* in the Complaint as purportedly attacking the design of Gardasil. JA0878-0880. While the district court did *not* dismiss the negligence, failure to warn, and fraud claims, the district court's order apparently either dismissed or struck certain allegations within these claims. The district court's ruling is *procedurally* unsound.

On a Rule 12(c) motion, it is wrong to grant judgment on something less than an entire claim. *Kenall Mfg. Co. v. Cooper Lighting*, LLC, 354 F. Supp. 3d 877, 896 (N.D. Ill. 2018) (collecting cases) ("Rule 12(c) does not permit 'judgment' on part of a claim..."). The Seventh Circuit concluded it may be improper for a district court to grant a motion for judgment on the pleadings as to only part of a claim:

> [T]he question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief…[¶]…As a procedural matter, then, the City's motion for

50

judgment on the pleadings on parts of the First Amendment claim may have been improper.

*BBL,* , 809 F.3d at 325; *see also Doe v. Regents of the Univ. of California*, 2023 WL 6194148, at *3 (C.D. Cal. Aug. 11, 2023); *Alpha Tech Pet Inc. v. LaGasse*, LLC, 2017 WL 5069946, at *9 (N.D. Ill. Nov. 3, 2017) ("it is procedurally  improper ... to award judgment on the pleadings on part of a claim."); *Living on the Edge, LLC v. Lee*, 2015 WL 12661917, at *4 (C.D. Cal. Aug. 25, 2015) ("While neither party briefed this issue, the Court denies this Motion in part on the ground that Defendants cannot move for judgment on the pleadings with respect to less than a full cause of action."); *JPMorgan Chase Bank, N.A. v. Tesla, Inc.*, 2024 WL 4167340, at *11 (S.D.N.Y. Sept. 12, 2024) ("In short, claims in a complaint are each considered as a whole in determining whether a party is entitled to judgment on the pleadings as to that claim. Claims are not dissected into sub-parts in deciding whether the motion for judgment on the pleadings should be granted or denied.")

As the caselaw shows, the district court erred by *dismissing particular allegations and paragraphs* in the Complaint's claims on a 12(c) motion. Indeed, to date, the remaining MDL Plaintiffs remain bewildered by the exact reach of the court's order. For instance, was the

district court granting judgment on specific factual paragraphs in the

Complaint, and does that mean that, at trial, witnesses are not allowed

to mention ingredients contained in Gardasil or to discuss tests Merck

did (or did not) perform on Gardasil when testifying in support of

Plaintiffs' negligence and failure to warn claims?  Mere recitation of

such an erroneous evidentiary restriction at the pleadings stages is

sufficient to refute it. Simply put, the district court's order was

procedurally improper because it purported to  enter judgment on

specific allegations creating ambiguities that are the very reason why

partial 12(c) motions on specific allegations are not permitted. As one

district court aptly noted:

> The Court aligns itself with those courts that have found
> judgment on the pleadings on something less than an entire cause
> of action to be inappropriate…What Defendant is asking the Court
> to do — that is, strike the enumerated paragraphs from the
> Amended Complaint — is no more a "judgment on the pleadings"
> than would be an order on a motion *in limine* limiting the use to
> which the referenced [evidence] may be put at trial. Indeed, the
> Court finds it difficult to imagine how it would write a judgment
> in favor of Defendant on particular paragraphs of a complaint
> rather than any one discrete cause of action.

*Bolender v. Carnival Corp.*, 2014 WL 12527190, at *1 (S.D. Fla. Apr. 7,

2014).  In sum, the district court's 12(c) judgment on the pleadings,

which is more akin to a premature (and erroneous) evidentiary ruling

was *procedurally* flawed and should be reversed.

### B. The district court's dismissal of allegations identifying ingredients in Gardasil and inadequacies in the testing of Gardasil was *substantively* flawed.

Aside from the procedural errors, the district court's ruling was

also *substantively* wrong. It is undisputed that vaccine *design* defect

claims are preempted by federal law, *Bruesewitz v. Wyeth,* 562 U.S. 223,

233-43 (2011). As such, Plaintiffs did *not* bring a claim for design defect.

Rather, as permitted by federal and state law, Plaintiffs alleged

common law negligence, failure to warn and fraud claims. JA0477-0512.

Notably, while the Supreme Court held design defect claims are

preempted, it also held that negligence, fraud and failure to warn

claims are *not* preempted. *Bruesewitz*, 562 U.S. at 230, n.25 ("The

immunity does not apply if the plaintiff establishes by clear and

convincing evidence that the manufacturer was negligent, or was guilty

of fraud, intentional and wrongful withholding of information, or other

unlawful activity."); *see also* 42 U.S.C.A. § 300aa-22(b)(2) & § 300aa-

23(d)(2).

Accordingly, federal law specifically permits and encourages patients injured by vaccines to bring civil claims for other traditional state law tort claims including negligence, failure to warn and fraud. *Id*. Tellingly, federal law views a patient's right to sue vaccine manufacturers in court so highly that the Vaccine Act *prevents* states from enacting laws that would prohibit an injured plaintiff from seeking damages in civil court. 42 U.S.C.A. § 300aa-22(e).

Here, relying upon the fact that design defect claims are preempted, the district court stretched the law to breaking to hold that any *allegation* or *factual discussion* of Gardasil's *ingredients* as well as the way Merck conducted its clinical trials and *testing* are also preempted. JA0878-0880. However, there is nothing in the text of the Vaccine Act or *Bruesewitz* that supports the district court's holding. Rather, to the contrary, the Vaccine Act and *Bruesewitz* specifically permit claims for negligence, fraud and failure to warn. *Bruesewitz*, 562 U.S. at 230, n.25; *see also* 42 U.S.C.A. § 300aa-22(b)(2) & § 300aa-23(d)(2).

1. **Allegations and Evidence Regarding Gardasil's *Ingredients* are relevant to *plaintiffs' failure to warn claims.***

The individual ingredients in a product and their individual or collective risks are relevant to what *warnings* should have been provided by the manufacturer. Here, Plaintiffs have advanced various permissible state law causes of action (i.e., negligence, failure to warn, and fraud) under the laws of their respective home states.[14]

In most jurisdictions, claims of negligence or failure to warn have the same essential elements: duty, breach, causation and damages.[15] *See e.g., Stegall v. Catawba Oil Co. of N. C.,* 260 N.C. 459, 464 (1963); *Crews v. W.A. Brown & Son, Inc.*, 106 N.C. App. 324, 329 (1992); N.C. GEN. STAT. § 99B-5.; *see also Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318,

---

[14] Bergin and America the individual plaintiffs whose complaints were the subject of Merck's motion were residents of North Carolina and New York respectively. As outlined above, the district court applied its order on their claims only to all MDL plaintiffs [see JA0872-0873, JA0890], including Needham, Walker and Roman who are residents of and whose claims are subject to the laws of Oregon, Minnesota and Illinois.

[15] Most states also permit failure to warn claims based on strict liability, though a minority of states (including North Carolina) do not. *See e.g.,* N.C. Gen. Stat. § 99B-1.1

332 (4th Cir. 2013); *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 992 (E.D.N.C. 2015).

In most states, the duty to warn is governed by common law, while in addition to common law, some states have codified their duty to warn by statue. For example, North Carolina provides that a manufacturer is liable for failure to warn if it fails to warn of risks or dangers "*that the manufacturer or seller knew, or in the exercise of ordinary care should have known"* or if it is established that post-distribution, *the manufacturer or seller became aware of or in the exercise of ordinary care should have known that the product posed a substantial risk of harm"* and failed to take reasonable steps to give adequate warnings. *See* N.C. Gen. Stat. Ann. § 99B-5(a). Further, "state-of-the-art evidence helps shape the duty owed by the alleged tortfeasor" and is relevant and admissible on a failure to warn claim. *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 280 (4th Cir. 1993). "State of the art represents all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available." *Id.*

Certainly, the *ingredients* contained in Gardasil are indispensable factors/evidence concerning risks associated with Gardasil and risks Merck knew or should have known existed, triggering a duty to warn. Plaintiffs allege Gardasil causes autoimmune and neurological injuries, and Merck failed to adequately warn about these risks. Naturally, what causes the alleged harm is Gardasil's *ingredients* and their interaction with the human body. To establish the risk of autoimmune injury, Plaintiffs have alleged (and intend to prove at trial) the mechanism of action (e.g., molecular mimicry) and how Gardasil's HPV virus-like particles share homology and mimic human proteins causing the body to attack its own tissue (mistaking it for HPV). JA0421-0425 & JA0440-0443. Furthermore, the adjuvants (including the aluminum and the unlabeled immunogenic viral DNA fragments) in Gardasil enhance the body's immune response resulting in neuroinflammation and autoimmune injuries. *Id.* Evidence regarding Gardasil's ingredients is thus central to proving the risks of Gardasil and demonstrating that Merck is liable (under a failure to warn theory) for failing to adequately disclose these risks.

Furthermore, a central piece of evidence in this failure to warn case will be Gardasil's label (JA0277), which contains a discussion of some of Gardasil's ingredients (albeit not all, see JA0422-0423, 0483) as well as identifies certain risks (again, not all serious risks). *See* JA0277 (discussing Gardasil's ingredients under "Description") and JA0276. Thus, the fact that the label discusses the *ingredients* and references them when purporting to warn of "contraindications" (JA0276), further confirms that Gardasil's ingredients *are relevant* to whether Merck provided adequate warnings about Gardasil's risks.

In sum, it is impossible to discuss and explain to the jury why Gardasil can induce autoimmune diseases without a discussion of Gardasil's ingredients and their relevance to showing how Merck failed to warn Plaintiffs of Gardasil's autoimmune disease risks. *See e.g., Pilliod v. Monsanto Co.*, 67 Cal. App. 5th 591, 603 (2021) (evidence of the ingredients and the carcinogenic propensity of the ingredients in combination was introduced in trial as they were relevant to where the product caused cancer and if, among other things, defendant failed to warn of cancer risks); *Davis v. Wyeth Lab'ys, Inc.*, 399 F.2d 121, 127

58

(9th Cir. 1968) (in failure to warn case evidence included that the vaccine ingredients included live strain of virus).

Finally, while the ingredients of Gardasil may also be relevant to a design defect claim (a claim plaintiff has not brought), as outlined above, the ingredients (and their risks) are *independently* highly relevant to the negligence and failure to warn claims, and it would be inappropriate to exclude them from evidence. Fed. R. Evid. 105, 210, 351; *In re St. Jude Med. Devices Litig.*, 2014 WL 12564117, at *9 (C.D. Cal. Jan. 22, 2014) ("Here, the Court notes that the allegations to which Defendant points in support of its assertion that Plaintiffs attempt to assert preempted claims provide general support to Plaintiffs' (non-preempted) state-law negligent failure-to-warn claim…")

### 2. Allegations concerning the manner in which Merck conducted its clinical trials and safety testing is relevant to Plaintiff's negligence and failure to warn claims.

The district court also seems to have dismissed allegations that discuss, question, or challenge the way Merck studied, monitored or tested the safety of Gardasil. JA0879-0880. The district court wrongly concluded that such allegations are *only* applicable to a design defect claim. *Id*. Contrary to the district court's ruling, case law confirms that

evidence that the defendant failed to conduct adequate testing are relevant to a *negligence* and *failure to warn claims*, because a manufacturer cannot provide adequate warnings if it did not properly test the product. *Morgan v. Cavalier Acquisition*, 111 N.C. App. 520, 528–29, 432 (1993); *Fontenot v. TASER Int'l*, 2011 WL 2535016, at *11 (W.D.N.C. June 27, 2011); *see also Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013) (evidence of what risks testing showed was relevant to plaintiff's failure to warn claim). New York law, which governs America's claims, is in accord:

> Thus the court concludes that Plaintiff has adequate legal support to present evidence to the jury that Defendant failed to conduct reasonable testing, which would have revealed risks concerning the implantation of its device in obese patients, and that Defendant failed to warn about that risk and its lack of adequate testing.

*In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 2017 WL 36406, at *13 (N.D. Ill. Jan. 3, 2017). Indeed, case law confirms that evidence of a lack of testing is relevant to and a subpart of a failure to warn claim. *Kociemba v. G.D. Searle & Co.*, 707 F. Supp. 1517, 1528 (D. Minn. 1989) (duty to test is a subpart of a *failure to warn claim* and further holding that "the reason that manufacturers are under a duty to test their products is to discover defects or dangers associated with use

60

of the products."); *Elam v. Lincoln Elec. Co.*, 362 Ill. App. 3d 884, 890, 841 (2005); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 2020 WL 4437829, at *6 (N.D. Ill. Aug. 2, 2020) (evidence of failure to test is relevant to failure to warn claim); *In re Prempro Prod. Liab. Litig.*, 2006 WL 1981902, at *4 (E.D. Ark. July 13, 2006) ("evidence of 'failure to test' will be received in connection with the negligence and failure to warn claims.")

Indeed, it is the testing that exposes to the manufacturer the risks associated with its product triggering its duty to warn. Here, Merck has been relying upon its studies and testing to argue Gardasil is risk free, so Plaintiffs have every right to allege Merck's tests were shoddy, crafted to conceal risks, and inadequately performed. These allegations (which have since been established by testimony, including expert testimony), include *inter alia* that Merck engaged in flawed and deficient testing by, among other things: using aluminum (in lieu of a true placebo) as the "placebo" thus masking any risks that could be attributable to aluminum in the clinical trials; failing to properly capture serious and long term adverse events associated with Gardasil;

61

and failing to conduct adequate post-marketing testing and analyses of reported adverse events. *See* JA0426-0453 & JA0479-0481.

### C. The district court *substantively* erred in purportedly dismissing factual allegations concerning Merck's misrepresentations and concealment of autoimmune injuries in its direct-to-consumer television advertising.

Under the guise of a Rule 12(c) motion, the district court also dismissed any allegations that Merck made misrepresentations and omissions in its ubiquitous direct-to-consumer television advertisements targeted to patients and parents of teenagers. The court relied on the Vaccine Act, which provides:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death …, ***solely*** due to the manufacturer's failure to provide direct warnings to the injured party (or the injured party's legal representative) of the potential dangers resulting from the administration of the vaccine manufactured by the manufacturer.

42 U.S.C.A. § 300aa-22(c) (emphasis added). However, Plaintiffs here are ***not*** "*solely*" relying upon the misrepresentations and omissions Merck made to them and their parents through its direct-to-consumer television advertising. Rather, Plaintiffs also alleged Merck failed to provide adequate warnings *to their respective prescribing doctors*. See JA0458 & JA0478-0491. Because Plaintiffs' Complaints include Merck's

failure to warn their respective doctors, the failure to warn claims are not barred by the Vaccine Act or the learned intermediary doctrine. *See Colbath v. Merck*, 2022 WL 935195, at *4 (S.D. Cal. Mar. 29, 2022) ("Because Plaintiff alleges that Defendants failed to warn his medical providers [in addition to alleging a failure to warn the plaintiff], the Vaccine Act and the Learned Intermediary Doctrine do not bar his failure to warn claims."); *Holmes v. Merck*, 697 F.3d 1080, 1084 (9th Cir. 2012) (holding that "Section 22 expressly preempts tort suits based 'solely' on the manufacturer's failure to provide direct warnings to the injured party" and that "we do not suggest that the Act otherwise forecloses a parent's state law claims").

Bifurcating the failure to warn claim as the district court has done, i.e., dismissing the failure to warn claim as to Plaintiffs but allowing the failure to warn claim as to the medical providers, is not consistent with the text of Section 22(c) (and is also *procedurally* impermissible under Rule 12(c) of the Civil Rules of Procedure for the reasons outlined above). JA0881-0883. The Vaccine Act is explicit: it only bars the claim when the plaintiffs' damages arise "***solely*** due to the manufacturer's failure to provide direct warnings to the injured

63

party." Stated differently, when the plaintiff's damages arise because of a failure to warn ***both*** the plaintiff and the medical providers, there is no preemption bar to any subpart of the claim. Further, if there is any doubt as to the meaning of "solely," it must be construed against preemption. *Altria v. Good*, 555 U.S. 70, 77 (2008).

### 1. Once Merck Chose to Communicate Directly to Patients Through Television Advertising, Merck Undertook a Duty to Speak the Whole Truth and to Not Mislead.

Contrary to the district court's implicit conclusion, neither the Vaccine Act nor the learned intermediary doctrine gave Merck permission to engage in misrepresentations and fraud *directed* towards consumers. *See Bruesewitz*, 562 U.S. at 230, n.25. To enhance sales, Merck *chose* to spend millions of dollars marketing Gardasil on television directly to consumers, including parents of minors. *See e.g.,* JA0411-0414, JA0501-JA505. Even assuming Merck did not have a duty to speak with (or warn) consumers, it is black-letter law that, once Merck intentionally and voluntarily decided to speak directly to consumers, including to patients and their parents (to promote and enhance sales), Merck invited upon itself a duty to speak *truthfully* and a duty to tell *the whole truth. Tillery Env't v. A & D Holdings*, 2018 WL

64

802515, at *7 (N.C. Super. Feb. 9, 2018) ("even when no duty to disclose exists, a party who chooses to speak has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak."); *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974) ("The rule is that even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses."). The law in other states, including the states of the Plaintiffs, is in accord. *See Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1222 (9th Cir. 1999); *Gregory v. Novak*, 121 Or. App. 651, 655 (1993); *Swedeen v. Swedeen*, 270 Minn. 491, 500 (1965); *Peter J. Hartmann Co. v. Cap. Bank & Tr. Co.*, 296 Ill. App. 3d 593, 601 (1998) ("Fraudulent misrepresentation claims do not require articulation of a duty to disclose as an element of the cause of action, because such claims are predicated on a more general moral obligation to speak the truth and not to deceive when an affirmative action is taken, such as a representation intended to initiate a response on the part of the reliant recipient."); *see also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016) ("A statement that contains only favorable matters and omits all reference to unfavorable

65

matters is as much a false representation as if all the facts stated were untrue.") (citing Restatement (Second) of Torts, § 529, Comment a (1976).

Here, the Complaints adequately and properly allege Merck made false and misleading statements in its direct-to-consumer commercials concerning Gardasil's efficacy and downplayed the risks, and that Plaintiffs or their mothers detrimentally relied upon these commercials. *See e.g.,* JA0411-0414, JA491 & JA0501-JA505. As the cases above provide, even assuming that, under the Vaccine Act or the learned intermediary doctrine, Merck had no affirmative duty to directly warn patients, when Merck chose to directly speak with these patients (solely to increase the sales of Gardasil), Merck assumed a duty to speak the *full* truth, and can be held liable for misrepresentations, concealment and deception in the advertising, on which Plaintiffs relied. *Ragsdale*, 286 N.C. at 139. In denying Merck's identical argument, one trial court recognized:

> Defendants also argue that the Vaccine Act and the Learned
> Intermediary Doctrine bar Plaintiff's intentional
> misrepresentation claim. As discussed above, Defendants fail to
> cite to any section of the Vaccine Act that would apply to an

> intentional misrepresentation claim based on intentional
> misrepresentations made directly to the patient.
>
> ***
>
> Defendants fail to cite to any case law applying the learned
> intermediary doctrine to cases of fraud based on drug
> manufacturer's misrepresentations in advertisements
> intentionally directed at patients and the general public. As
> Plaintiff argues in opposition, the learned intermediary doctrine
> applies to the duty to warn as to prescription drugs, while
> Plaintiff's fraud claim is based in part on the duty not to make
> affirmative misrepresentations.

*See* JA0641-0642 (*Shain v. Merck,* Case No. 21STCV35340 (CA Superior

Court, Los Angele County) (August 4, 2022)). Simply put, neither the

Vaccine Act nor the learned intermediary doctrine give Merck a pass to

intentionally make misrepresentations to patients and parents through

direct-to-consumer advertising. The Vaccine Act specifically *prohibits*

fraud and provides that a plaintiff is entitled to punitive damages if she

establishes the manufacturer engaged in "intentional and wrongful

withholding of information relating to the safety or efficacy of the

vaccine after its approval; or…*other criminal or illegal activity relating

to the safety and effectiveness of vaccines.*" *See* 42 U.S.C.A. § 300aa-

23(d)(2)(B)&(C) (emphasis added). The district court's ruling effectively

*and erroneously* concludes pharmaceutical companies are afforded

immunity to commit fraud directed towards consumers. The ruling should be reversed.

### 2. Affirmative fraud premised upon the direct-to-consumer advertisements was adequately pled.

The fraud claim was adequately pled. *McCauley v. Home Loan Inv. Bank,* 710 F.3d 551, 559–60 (4th Cir. 2013). Under Rule 9(b), a complaint must allege the who, what, when, where, and how of the alleged misrepresentations and omissions. *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II*, 888 F.3d 696, 705 (4th Cir. 2018). These requirements are exacting but not absolute. *McCauley,* 710 F.3d at 559. Further, as this Circuit has observed, "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012); *Dennis v. Bayer Healthcare Pharms.*, 2020 WL 534307, at *7 (W.D.N.C. Feb. 3, 2020); *Reed v. Smith & Nephew*, 150 F. Supp. 3d 671, 691 (S.D. W. Va. 2015); *Miller v. 3M*, 2013 WL 1338694, at *2 (E.D.N.C. Apr. 1, 2013).

Specifically, in the Bergin Complaint that was the subject of the Rule 12(c) motion, the plaintiff alleged her mother (who provided

68

consent for her daughter (age 13), had, prior to consenting been exposed to Gardasil "One Less" and other advertisements touting Gardasil as preventing cancer with no serious side-effects. *See* JA0411-0414, JA491 & JA0501-JA505. These representations were false because, among other things, Merck knew that (a) no clinical trials had shown Gardasil prevents cancer; (b) some Gardasil clinical trials showed Gardasil increased the risk of cancer in some patients (including those who had previously been exposed to HPV); (c) contrary to its claims that risks were limited to injection site pain, Merck knew Gardasil could cause serious and disabling autoimmune and neurological injuries, yet did not disclose these in its direct-to-consumer advertisements (on which Plaintiff and her mother relied); and Plaintiff sustained autoimmune and autonomic injuries as a results of her Gardasil injections. *See* JA0411-0414, JA457, JA0471-0476, JA0479-0485, JA491 & JA0501-JA505. These detailed allegations describe the *who* (Merck), the *what* (made false representations concerning the safety and efficacy of Gardasil), *where* (in television commercials, such as the One Less commercial), *when* (at and around the time Plaintiffs received their respective Gardasil injections (June 11, 2013 and February 25, 2014 for

69

plaintiff, Bergin)); and *how* (the representations were false because,

*inter alia*, Gardasil has not been proven to prevent cancer as the clinical

trials did not test this endpoint, Gardasil in certain patients can

increase the risk of cancer, and Gardasil can cause serious undisclosed

disabling injuries). These allegations are more than adequate to allege

fraud. Indeed, a state court recently held another Gardasil plaintiff

whose complaint was similar to Bergin's, had adequately alleged fraud

against Merck:

> These allegations sufficiently allege fraud against Defendants.
> The nature of the misrepresentations, including whether they
> were written or verbal, is alleged. The alleged misrepresentations
> were made in advertisements and marketing materials approved
> by and from Merck. The advertisements are specifically identified.
> Plaintiff alleges that he received his shot in 2018 and at least one
> of the campaigns was conducted in 2016. This is sufficient for
> Defendants to discern when the alleged representations were
> made.

*See* JA0641-0642 (*Shain v. Merck* Order).  For the foregoing reasons,

the district court's erroneous partial dismissal of allegations related to

Plaintiffs' fraud cause of action should be reversed.

## III.  The Vaccine Act Is Unconstitutional.

The Vaccine Act is unconstitutional because it purports to

empower the Secretary to amend the Act without Congressional action

in violation of the presentment clause. U.S. Const. art. I, § 7, cl. 2. The district court ruled otherwise and should be reversed. JA1367-1377.

In 1986, Congress evaluated the needs of children injured by vaccines and weighed this against the need to ensure adequate supplies of vital vaccines by creating the statutory Vaccine Table. Pub. L. 99-660 § 2114 (codified at 42 U.S.C. § 300aa-14). In 1995, the Secretary upended Congress' careful balance by creating a superseding table by regulation in 1995. 60 Fed. Reg. 7678-01. In 2007, the Secretary added Gardasil with virtually no compensable injuries. 72 Fed. Reg. 19937-01.

The Table is the heart of the Act because it defines the vaccines governed by the Act and their presumptively compensable injuries. 42 U.S.C. §§ 300aa-11(a)(2)(A), 300aa-14(a), 300aa-16(a)(2), 300aa-33(5). The Table is set forth in the Act itself, and its original text was passed by both houses of Congress, presented to the President, and signed into law in 1986. Pub. L. 99-660 § 2114 (codified at 42 U.S.C. § 300aa-14); Statement of Pres. Ronald Reagan upon Signing S. 1744, 22 Weekly Comp. Pres. Doc. 1565 (reprinted in 1986 U.S.C.C.A.N. 6410) (Nov. 24, 1986). The statutory Table remains in the Act unchanged. 42 U.S.C. § 300aa-14.

71

The presentment clause provides statutes can only become law by vote of both houses of Congress, presentment to the President, and his signature. U.S. Const. art. I, § 7, cl. 2. "Amendment and repeal of statutes, no less than enactment, must conform with" this requirement. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 954 (1983); *see also Clinton,* 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.") Absent the presentment clause, any particular Congress and President could permanently end the separation of powers by passing a statute that allows the executive branch to unilaterally alter statutes in the future. *Chadha.* 462 U.S. at 951 ("The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.")

The Act violates the presentment clause because it purports to delegate to the Secretary authority to amend the text of the statutory Table. 42 U.S.C. § 300aa-14 (c)(3), (e); U.S. Const. art. I, § 7, cl. 2; *Clinton*, 524 U.S. at 448; *Terran*, 195 F.3d at 1312-1314 (Plager, J. dissenting). Moreover, the Vaccine Act included a nonseverability

72

clause, so if any portion violates the presentment clause, the entire Act is void. Pub. L. No. 99-660, Title III, § 322 ("'42 USC 300aa-1 – note' NONSEVERABILITY"); *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (courts must follow the text of a nonseverability clause included in a statute).

### A. The Secretary rewrote the statutory Vaccine Table to destroy the balance struck by Congress in 1986.

As explained above, the Act was intended to balance the need to compensate those injured by vaccines "quickly, easily, and with certainty and generosity" against the need to insure a reliable supply of vital vaccines. H.R. Rep. No. 99-908, at 3. The Act's statutory Table did so by carefully creating a list of vital childhood vaccines and generously defining injuries for compensation in the no-fault VICP. This Congressional compromise was destroyed when the Secretary created a new regulatory table to replace the carefully negotiated statutory one. Peter H. Meyers, *Fixing the Flaws in the Fed. Vaccine Inj. Comp. Program*, 63 ADMIN. L. REV. 785, 801-802 (2011).

The Secretary's revisions were so drastic they eliminated any no-fault remedy for most injured by vaccines. *Id.* at 799-800. Gardasil, for

73

example, has no significant listed Table Injuries.[16] Jamie J. Sack*, "One Less" Avenue of Recovery?: The Treatment of Gardasil under the Nat'l Vaccine Injury Compensation Program*, 19 FED. CIR. B.J. 663, 664-667 (2010).

While Table Injuries made up 75% of claims before the Secretary's changes, they now make up only 5%. Nora Freeman Engstrom, *A Dose of Reality for Specialized Courts: Lessons from the VICP*, 163 U. PA. L. REV. (2015); Meyers, *supra*, 63 ADMIN. L. REV. at 799 ("The Table changes have in effect created a new and different vaccine compensation program."); Betsy J. Gray, *The Plague of Causation in the Nat'l Childhood Vaccine Injury Act*, 48 HARV. J. ON LEGIS. 343, 344-346 (2011) (Table claims had fallen to 10% by 2010); *see also* Brandon L. Boxler, *Fixing the Vaccine Act's Structural Moral Hazard*, 12 PEPP. DISP. RESOL. L.J. 1, 12-15 (2012) (noting the addition of vaccines to the Table by the Secretary with no listed injuries destroyed the no-fault, streamlined nature of the program intended by Congress).

---

[16]    Many other vaccines similarly have no significant listed Table Injuries on the Secretary's Table. 42 C.F.R. § 100.3(a).

The Secretary's unilateral changes ended the quick and easy "no fault" system originally enacted by Congress, and put those injured by vaccines into an expensive, slow, adversarial system. *Id.*; *see also Thomas on behalf of Z.T. v. Sec'y of Health & Human Servs.*, No. 20-886V, 2021 WL 2389837, at *3 (Fed. Cl. May 17, 2021) (noting that it has become very rare for any claim to be resolved in less than 240 days as required by the Vaccine Act). By executive action alone, the Secretary returned those injured by vaccines to the very burdens that plagued them in the civil tort system that Congress intended to eliminate while simultaneously limiting the rights they previously had in that system. The Secretary's new 1995 Table not only repealed and replaced the statutory Table, it fundamentally changed the Act's practical impact on those injured by vaccines.

## B.    The Vaccine Act violates the presentment clause.

Because the Act allows the Secretary to amend the statutory Table, it violates the presentment clause and is unconstitutional. U.S. Const. art. I, § 7, cl. 2; 47 U.S.C. § 300aa-14(c)(3), (e)(1)-(3).[17] Moreover,

---

[17]    The original Act allowed amendment of compensable injuries only, but a 1993 amendment allowed the Secretary to add vaccines to the Table and required the Secretary to add all vaccines recommended by

the sections purporting to allow the Secretary to amend the statutory table cannot be severed to save the rest of the Act because the Act includes a nonseverability clause. Pub. L. 99-660, Tit. III, § 311 ("§ 2214 42 U.S.C. 300aa-14 (c)(3)"); *Barr*, 140 S. Ct. at 2349.[18]

---

the CDC. Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312, § 13632 (codified at 42 U.S.C. § 300aa-14(e)). The CDC is within the Department of Health and Human Services and like the Secretary is part of the executive branch. https://www.hhs.gov/about/agencies/hhs-agencies-and-offices/index.html. Congress can no more delegate power to the CDC to amend the Vaccine Act than it can delegate that power to the Secretary. *Clinton*, 524 U.S. 417, 436; *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1082 (D.C. Cir. 2017) (Kavanaugh, J.) (agency cannot change the text of a statute by carefully following administrative procedures).

[18]    Merck argued below that because Congress passed a law taxing Gardasil in 2006, the addition of Gardasil to the Secretary's Table did not violate the presentment clause. JA1198. Merck's argument was wrong because Congress never passed a law adding Gardasil to the Act's Table, and the law taxing Gardasil was passed before the Secretary added Gardasil with virtually no injuries. Pub. L. 109-432, § 408(b) (Dec. 20, 2006); 72 Fed Reg. 19937-01 (Feb. 7, 2007). Congress could not have exercised its judgment as to which Gardasil injuries should be compensable under the Act before the Secretary determined what those injuries would be. *Id.* The district court's opinion ignored the Act's nonseverability clause and did not address Plaintiffs' argument concerning its impact on Merck's tax law argument. JA1367-1377.

### 1. The Supreme Court's Presentment Clause Cases, *Field* and *Clinton*.

Article I, section 1, of the Constitution vests all legislative power in Congress. The presentment clause requires that all bills must be passed by both houses of Congress and "presented to the President of the United States" if they are to become law. U.S. Const. art. I, § 7, cl. 2. The Supreme Court has twice considered whether a statute violated the presentment clause because the statute improperly delegated legislative authority to the executive branch. *Clinton*, 524 U.S. at 438; *Marshall Field & Company v. Clark*, 143 U.S. 649, 680 (1892).

### a. *Field* distinguished between Congress delegating power to execute a statue and impermissibly delegating power to make the law.

The *Field* plaintiff challenged a reciprocal free trade statute that prohibited tariffs on sugar and other commodities, but required the President to impose reciprocal tariffs if a country imposed its own tariff. 143 U.S. at 680. The plaintiff argued the statute impermissibly authorized the President to legislate, but the Court disagreed. *Id.* at 692. The Court first stated, "That congress cannot delegate legislative power to the president is a principle universally recognized as vital to

the integrity and maintenance of the system of government ordained by the constitution." *Id.* The Court then held the tariff statute did "not, in any real sense, invest the president with the power of legislation" because the statute simply directed the President to impose reciprocal tariffs if a foreign country imposed its own tariffs. *Id.* This was "simply execution of the act of congress. It was not the making of laws." *Id.* at 693. Put another way, "The true distinction … is between the delegation of power to make the law, which necessarily involves the discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised pursuant to the law." *Id.* (quoting *Cincinnati, W. & Z.R. Co. v. Clinton Cnty. Comm'rs*, 1 Ohio St. 77, 88-89 (1852)).

> **b.**   ***Clinton* held the Line-Item Veto Act violated the presentment clause and was unconstitutional.**

In *Clinton*, the Court held the Line-Item Veto Act, 2 U.S.C. §§ 691 *et seq.* (1994 ed. Supp. II), violated the presentment clause. 524 U.S. at 448-449. The Act allowed the President to cancel "(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit." 2 U.S.C. § 691(a) (1994 ed., Supp. II). The Act further required the President to determine with respect to each

78

item cancelled "that it will '(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest.'" *Clinton*, 524 U.S. at 436 (quoting 2 U.S.C. § 691(a)(3)(A)). It also required the President to notify Congress within five days of each cancellation. *Id.* The cancellation would take effect upon receipt by Congress, but the Act provided for an expedited procedure to pass a "disapproval bill" that would render the President's cancellations "null and void." *Id.*

President Clinton used the act to cancel a provision in a bill that forgave New York's obligation to return certain Medicaid funds and a provision in another bill that expanded a tax break to include agricultural cooperatives. New York and an agricultural cooperative sued arguing the Act was unconstitutional, and the President's cancellation was void. The Court agreed.

The Court observed, "in both legal and practical effect, the President has amended two acts of Congress by repealing a portion of each. 'Repeal of statutes is no less than enactment, must conform with Art. I.'" *Id.*, at 438 (quoting *Immigration and Naturalization Service v.*

79

*Chadha*, 462 U.S. 919, 954 (1983)).[19] "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.*

Citing *Field*, the government argued the Line-Item Veto Act merely gave the executive branch discretionary authority to cancel spending which was the functional equivalent of declining to spend money appropriated by Congress, a permissible exercise of discretion by the executive branch. *Id.* at 442. *Clinton* rejected this argument.

*Clinton* distinguished *Field* in three ways. *Id.* at 443. First, the exercise of discretion in *Field* was contingent on a future external event, not an act by the executive branch itself. Second, the Tariff Act in *Field* required the executive branch to act if a foreign country imposed a tariff and gave it no discretion not to act. *Id.* Third, the Tariff Act required the executive branch to act in accordance with the Tariff Act's policy of

---

[19]    *Chadha* considered a statute authorizing the Attorney General to suspend orders of deportation but allowed the House alone to "veto" such a suspension. 462 U.S. at 923-924. The plaintiff argued this legislative veto violated the presentment clause, and the Court agreed. *Id.* at 958-959.

creating reciprocal tariffs, not to further a policy of the executive branch itself.

In contrast, the Line-Item Veto Act allowed the executive branch to act of its his own volition, without any external event, and to further its own policies. *Id.* The Court also noted that foreign trade is an area where the executive is afforded great discretion, so *Field*, and the many other cases considering similar trade provisions, were inapposite to the presentment issues in the Line-Item Veto Act. *Id.* at 445. The Court concluded, "The Line-Item Veto Act authorizes the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7. The fact that Congress intended such a result is of no moment." *Clinton*, 524 U.S. at 445-446.

*Clinton* went on to expressly reject the government's argument that the cancellations were nothing but discretionary decisions to refrain from spending appropriated funds which have long been allowed both in practice and by statutory text. *Id.* at 446. The Court held, "The critical difference between this statute and its predecessors, however, is that unlike any of them, this Act gives the President the unilateral power to change the text of duly enacted statutes. None of the act's

81

predecessors could even arguably have been construed to authorize such a change." *Id.* at 447.

Concurring, Justice Kennedy wrote:

> It is no answer, of course, to say that Congress surrendered its authority by its own hand; nor does it suffice to point out that a new statute, signed by the President or enacted over his veto, could restore to Congress the power it now seeks to relinquish. That a congressional cession of power is voluntary does not make it innocuous. The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow. See *Freytag v. Commissioner,* 501 U.S. 868, 880 (1991); cf. *Chadha, supra,* at 942, n. 13. Abdication of responsibility is not part of the constitutional design.

*Clinton*, 524 U.S. at 451–52.

### c. *Terran* is contrary to *Clinton* as shown by Judge Plager's dissent.

In Terran, the Federal Circuit considered whether the Vaccine Act was unconstitutional because it violated the presentment clause. *Terran ex rel. Terran v. Sec'y of Health and Human Servs.*, 195 F.3d 1302, 1306 (Fed. Cir. 1999). Over a well-reasoned dissent, the majority in *Terran* incorrectly held the Vaccine Act's purported delegation of power to the Secretary to rewrite the Vaccine Table did not violate the presentment clause. *Id.* No other federal circuit has addressed the issue, and the only

other cases to have addressed it have been lower courts bound by *Terran* and the district court in this case.[20]

*Terran* is contrary to *Clinton* and the language and structure of the Constitution and should not be followed. *Clinton* held Congress cannot delegate to the executive branch the power to change the text of a statute, but that is exactly what the Vaccine Act did with respect to its Vaccine Table. The Court should follow *Clinton* and the dissent by Judge Plager in *Terran* and find that the Vaccine Act's provision purporting to allow the Secretary to amend the Act's Vaccine Table is unconstitutional and renders the entire Act invalid.

On September 22, 1993, six-month old Julie Terran received her third DPT vaccine which utilized whole-cell pertussis bacteria. *Terran,* 195 F.3d at 1306. The next day, she began suffering seizures. *Id.* In November 1993, she was diagnosed with developmental delay. *Id.* On July 12, 1995, Julie filed a claim in vaccine court alleging the DPT vaccine caused her to suffer residual seizure disorder (RSD) and encephalopathy. *Id.* at 1308.

---

[20]    The First Circuit recognized the constitutional problem but did not reach it. *O'Connell v. Shalala*, 79 F.3d 170, 173, n.2 (1st Cir. 1996).

The Vaccine Injury Table as drafted by Congress listed RSD manifesting within 3 days of receipt of the whole-cell pertussis DPT vaccine as a Table Injury. Pub. L. 99-660 § 2114 (codified at 42 U.S. § 300aa-14(a)). It also listed encephalopathy as a Table Injury and defined the term broadly. *Id.*

The Secretary's new vaccine injury table removed RSD as a table injury for the DPT vaccine and significantly narrowed the definition of encephalopathy. 42 C.F.R. § 100.3 (1996). The new table became effective after Julie was injured but just weeks before she filed her petition. 195 F.3d at 1308. Under the new table, Julie's injuries were no longer Table Injuries, and the special master ruled she failed to show causation, denying her claim. *Terran*, 195 F.3d at 1308.

Julie appealed to the Federal Circuit arguing the Vaccine Act's provisions allowing the Secretary to amend the Vaccine Injury Table violated the presentment clause and were unconstitutional. *Id.* at 1309. *Terran* acknowledged, "The Constitution does not authorize members of the executive branch to enact, amend or repeal statutes." *Id.* at 1312 (citing *Clinton*, 524 U.S. at 438). Nevertheless, the court allowed exactly that.

First, *Terran* reasoned that even though the Act allows the Secretary "to modify" and "to amend" the Table, "a closer reading of that section makes clear that when the Secretary acts pursuant to section 300aa-14(c), she does not change in any way the original table, but rather promulgates an entirely new vaccine injury table. This new table applies only prospectively." 195 F.3d at 1312. *Terran's* reasoning is pure sophistry. Leaving the original table intact but superseded by an entirely new table is indistinguishable from repealing and replacing it. Despite its assertions to the contrary, *Terran*, held the Vaccine Act gives the Secretary the power to "change the text of [a] duly enacted statute," but that is contrary to the presentment clause. *Clinton*, 524 U.S. at 447.

Next, *Terran* noted that Congress intended that the statutory Table "would cease to apply to newly filed petitions when the Secretary promulgated a revised injury table." *Terran,* 195 F.3d at 1313. But as *Clinton* held, "the fact that Congress intended such a result is of no moment." 524 U.S. at 445-446. *Terran* reasoned this was analogous to a "'sunset provision' that Congress routinely includes in legislation to specify the date on which a particular piece of legislation ceases to have

effect." 195 F.3d at 1313. *Terran* conceded that the Act contains no "sunset" provision, but still concluded that because the statute renders the statutory Table ineffective upon the Secretary's promulgation of a new Table, the Act does not violate the presentment clause. *Id.*[21] Once again, the court employed a transparently circular argument. Congress did not include a "sunset" provision, and if the Secretary's own decision to promulgate a new Table is a "sunset" provision, then it is an impermissible change to the text of the Act by the Secretary.

The court distinguished *Clinton* on three grounds. First, the court noted the Act like the tariff statute in *Field*, allowed changes only after future developments. *Id.* But the future developments in *Field* were external acts by foreign nations, not the internal actions of the HHS' or its subordinate agencies. Second, the court asserted the Line-Item Veto

---

[21]    *Terran* cited *Clinton's* reference to the Rules Enabling Act. 195 F.3d at 1313 (citing *Clinton*, 524 U.S. at 446 n.40). *Clinton* was citing *Sibbach v. Wilson & Company*, 312 U.S. 1 (1941), which arguably implicitly held the Rules Enabling Act (28 U.S.C. §§ 2071-2077) was constitutional. *Sibbach* does not support the idea that an executive branch agency can repeal a statute. *Sibbach* did not mention the constitution, and the Supreme Court has inherent authority to regulate the procedures in all Article III courts. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 21 (1825). The executive branch, in contrast, has no inherent authority to amend or repeal substantive statutes. *Clinton*, 524 U.S. at 447.

Act in *Clinton* placed little constraint on the President's exercise of discretion. *Terran*, 195 F.3d at 1314. The court baselessly claimed the Vaccine Act placed more constraints on the Secretary. *Id.* While the Act requires the Secretary to consult departments within HHS and follow administrative procedures, nothing in those consultations or procedures limits the Secretary's discretion to amend or repeal the statutory Table. 42 U.S.C. § 300a-14(c). No other executive branch official can amend or repeal statutes by simply following administrative procedures, and it is a remarkable change in the separation of powers to recognize Congress' "cession" of such power to the executive branch simply because it requires the executive branch to follow administrative procedures. *Clinton*, 524 U.S. at 451-452 (Kennedy, J. concurring); *see also Clinton*, 524 U.S. at 436 (Line-Item Veto Act's requirement that the President follow detailed procedures did not prevent it from violating the presentment clause); *Bais Yaakov,* 852 F.3d at 1082 (agency cannot change the text of a statute by carefully following administrative procedures). Finally, the court observed that in both *Field* and under the Vaccine Act, the executive branch actions furthered Congress' policy

goal while the Line Item Veto Act in *Clinton* thwarted it. *Id.* This is true, but as *Clinton* held is of "no moment." 524 U.S. at 445-446.

*Terran* is inconsistent with *Clinton*, and based on a flawed reading of the Supreme Court's presentment clause cases. Judge Plager who sat on the panel that decided *Terran* wrote a dissent cogently explaining as much. *Terran*, 195 F.3d at 1319-1321 (Plager, J. dissenting). Judge Plager's dissent explained why Congress could not delegate to the Secretary the power to re-write the Vaccine Act's statutory Vaccine Table, "Because 42 U.S.C. § 300aa–14(c) gives the Secretary unilateral power to amend the Vaccine Injury Table without complying with the bicameralism and presentment procedures required for legislative acts, the statute violates the Presentment Clause. 195 F.3d at 1319.

Judge Plager then explained, "The majority holds that the Vaccine Act does not authorize the Secretary to *amend* the original Vaccine Injury Table, but that it merely authorizes the creation of an entirely new table by regulation, the new table of course superseding the old one. That is little more than a transparent attempt to find a verbal formula for disguising the reality of what transpired … To paraphrase the words the Supreme Court used in *Clinton,* '[i]n both legal and

practical effect, the [Secretary] has amended [an Act] of Congress by repealing a portion of [it],' and '[t]he cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled.'" *Clinton,* 524 U.S. at 438, 441. *Id.* at 1319-1320. Finally, Judge Plager explained why the majority's reasoning was so dangerous to the constitutional order, "Words have consequences. The Constitution's constraints have served us well. Judges regularly attend to the constraints the Constitution places upon their own performance, such as the requirement for a genuine 'case' or 'controversy' before a federal court may exercise judicial power … When a case is before us, it is our obligation under the law to ensure that the other Branches equally conform to the Constitution's mandates, even when doing otherwise would seem to be simpler or more convenient." *Id.*, at 1321.

Judge Plager's reasoning and analysis was sound and persuasive while the majority's was not. *Terran* is contrary to the text of the Constitution and *Clinton* and should not be followed.

The Vaccine Act provision allowing the Secretary to amend the Vaccine Table violated the presentment clause and is unconstitutional.

Because the Act included a non-severability clause, the entire Act is unconstitutional. Gardasil is, therefore, not covered by the Act, and the district court erred by finding otherwise.

## VII. Conclusion.

For the foregoing reasons, the Court should reverse the district court's orders and remand this action for further proceedings.

## VIII. Request for Oral Argument.

Although brought by three individual Plaintiffs, the current appeal affects the claims of hundreds of persons arising from Defendants' Gardasil vaccine and raises issues of grave importance to not only these Plaintiffs, but also the rights and remedies available to all those injured by vaccines. In addition, whether the Vaccine Act is unconstitutional because it violates the presentment clause not only affects all those injured by vaccines but also raises important issues about the separation of powers and the power of the executive branch to legislate without the participation of Congress. Given the importance of the issues raised, oral argument is necessary to not only illuminate the issues for the Court, but also to allow a public forum in which to vet them.

DATED: December 4, 2024.

> */s/ Robert M. Hatch*
> Margery S. Bronster
> Robert M. Hatch
> Bronster Fujichaku Robbins, ALC
> Honolulu, HI 96813
> Telephone: (808) 524-5644
> mbronster@bfrhawaii.com
> rhatch@bfrhawaii.com
>
> Attorneys for Plaintiffs-Appellants Tessa
> Needham, Angela M. Walker, and Shanie
> D. Roman

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1828 L    Caption: In re Gardasil Products Liability Litigation

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style
Requirements

This brief contains 17,981 words and complies with the Type-Volume Limit because the Court granted Plaintiffs-Appellants' Motion to Exceed Length Limitations and allowed 18,000 words. Dkt. 27.

This brief complies with the typeface and type style requirements because:

This brief has been prepared in proportionally spaced 14 point Century School Book typeface using Microsoft Word.

DATED: December 4, 2024.

*/s/ Robert M. Hatch*
Margery S. Bronster
Robert M. Hatch
Bronster Fujichaku Robbins, ALC
Honolulu, HI 96813
(808) 524-5644
mbronster@bfrhawaii.com
rhatch@bfrhawaii.com

Attorneys for Plaintiffs-Appellants Tessa Needham, Angela M. Walker, and Shanie D. Roman